KNEELAND vs. THE CITY OF MILWAUKEE and others.

The court follow the decision in *The Milwaukee & Mississippi R. R. Co. vs. The Supervisors of Waukesha Co.*, decided at the June Term, 1855, holding that the law of 1854 (chap. 74), which required railroad companies and plank road companies to pay for the use of the state, one per cent of the gross earnings of their respective roads, which should be in full of all taxes of every kind upon such roads or the other property belonging to such companies or the stock held by individuals therein, is not in violation of that provision of the constitution of the state which requires "that the rule of taxation shall be uniform."

The majority of the court (DIXON, C. J., and PAINE, J.), would not hesitate to hold, if the question were a new one, that the act referred to is in violation of the article of the constitution above cited, but in view of the fact that all the taxation in the state and all the private transactions growing out of it, have, since 1855, been conducted upon the theory that said act is valid, and in view of the disastrous consequences which would now flow from overturning the decision made in 1855, they feel bound to return to and abide by that decision.

The case of *The State vs. The Win. Lake & Fox River Pl. R. Co.*, 11 Wis., 85, is January Term,
    overruled.                                                                    1862.

APPEAL from the Circuit Court for *Milwaukee* County.

This action was brought to restrain the issuing of tax deeds for certain property of the plaintiff in the city of Milwaukee, which had been sold for taxes for the years 1857, 1858 and 1859.    The first count in the complaint referred solely to the taxes for the year 1857, and from the decision of the circuit court in regard to that count no appeal was taken.    The second count alleged that the assessors for said city for the years 1858 and 1859, contrary to their duty, knowingly and intentionally omitted to assess, or place on the assessment roll for said years, certain real estate situate in said city, owned by other persons than the plaintiff, and subject to taxation like other property in said city, of the value of $500,000; and that no state, county, school, city or ward taxes were levied on said property for those years; by reason of which intentional omission, and the neglect of the board of supervisors and of the city council to levy the taxes upon said property for said years, the plaintiff alleged that the taxes levied upon his own property for those years were unconstitutional and illegal, and the sales of his property for their non-payment were void.    The third count related to the taxes of 1859, and was similar to the second.    The answer admitted the omission of a large amount of property from the assessment rolls for the years 1858 and 1859, but denied that the assessors, contrary to their duty, knowingly and purposely omitted it, but alleged that said property was omitted for the reason that part of it, at the time of the levying and assessing of said taxes, was the property of rail road companies then organized under the laws of the state, completed in whole or in part, and operated and used within the corporate limits of said city and county of Milwaukee, and part of it was public property of said city and county, used for corporate and public purposes, and part was property belonging to literary, benevolent, charitable and scientific institutions within said city and county, then actually used for the purposes for which such institutions were created; that the residue of the property omitted consisted of houses of public

*margin:* KNEELAND v. CITY OF MILWAUKEE et al.

worship, and the lots on which they were situated; public libraries, and the real estate and personal property belonging to and connected therewith; that all said property was by law exempt from taxation, or was to be taxed in a manner other than by assessment, in accordance with the constitution and laws of the state, and that it was the duty of said assessors to omit said property from the assessment rolls for those years; that if any property was omitted from the assessment rolls for those years, which, by the constitution and laws of the state, was subject to taxation or ought to have been included in such assessment, such omission was not wrongfully intentional on the part of said assessors, but on the contrary was omitted by mistake and without wrongful intent, in the belief on the part of the assessors that they were discharging their whole duty, according to law.—The court found as facts, that the plaintiff was the owner and in possession of certain real estate in the city of Milwaukee, as alleged in the complaint; that the several assessors for the city of Milwaukee, for the years 1858 and 1859, omitted to assess the several lots and tracts of land described in the complaint as having been omitted from the assessment rolls for those years; that such omission was occasioned by information and belief on the part of said assessors that said lots and tracts of land were the property of railroad companies duly incorporated, of religious societies, and of other corporations, persons and owners, whose property was by the laws of the state exempted and relieved from assessment and taxation in said city or county of Milwaukee; that nearly all of the property so omitted was in fact, in 1858 and 1859 respectively, the property of such railroad, religious and other corporations, persons and owners; that such omissions on the part of the assessors for 1858 and 1859, and the neglect to levy and assess any taxes upon said property, by the city of Milwaukee and the board of supervisors of the county of Milwaukee, was not an intentional, purposed or conscious violation of duty on the part of any or either of them, but occurred solely through their honest belief that said several lots and tracts of land were not by law liable to taxation, and that to assess the same and levy taxes thereon would be

illegal and void.  As conclusions of law upon these facts, the court held that the plaintiff was not entitled to the relief sought in the second and third counts in the complaint, and that the complaint as to those counts ought to be dismissed. The plaintiff excepted to the finding that the omission by the assessors to assess the real estate described in the second and third counts for the years 1858 and 1859, was occasioned by the information and belief on the part of the assessors that said real estate was the property of railroad companies, &c., and of other owners whose property was by the laws of the state exempted from assessment and taxation in the city or county of Milwaukee; and also to the finding that such omissions occurred solely through the honest belief of said assessors that said real estate was not by law liable to taxation.   He excepted also to the conclusions of law found by the court.   The evidence in the case was made a part of the record, but it is deemed unnecessary to state it here.

The statute in relation to the taxation of railroads was, in part, as follows: "It shall be the duty of the said railroad companies and plank road companies to pay or cause to be paid to the treasurer of the state for the use of the state, on or before the tenth day of January in each year, a sum equal to one per centum of the gross earnings of their respective roads so returned, which amount of tax shall take the place and be in full of all the taxes of every name and kind upon said roads or other property belonging to said companies, or the stock held by individuals therein, and it shall not be lawful to levy or assess thereupon any other or further assessment or tax for any purpose whatsoever; but when a railroad or plank road lies partly within this state and partly in another state or territory, the company shall pay such proportion of one per centum upon the gross earnings of the whole road so returned, as the length of that portion of the road within this state bears to the whole length of said road." Sec. 2, chap. 74, Laws of 1854; sec. 183, chap. 18, R. S., 1858.

The case was argued by *H. F. Prentiss, O. H. Waldo* and *E. G. Ryan*, for the appellant, and by *H. L. Palmer, Joshua Starks* and *Joshua LaDue*, for the respondent.

January Term,
1862.

Kneeland
v.
City of Mil-
waukee et al.

March 15.

*By the Court,* PAINE, J.   In the case of *The Attorney General vs. The Winnebago Lake and Fox River Plank Road Company,* 11 Wis., 35, this court decided that the law which attempted to make railroads and plank roads taxable by a different rule from that applicable to the general mass of taxable property, was unconstitutional.   The question is now made in this case, whether the omission by the assessors in the city of Milwaukee, to insert in the tax lists the large amounts of railroad property there, in pursuance of that law, does not invalidate the taxes imposed upon other property. The effect of a somewhat similar omission was considered by the court in the case of *Weeks vs. The City of Milwaukee,* 10 Wis., 242, where it was held that the omission in the tax list of a large property of great value, in pursuance of an ordinance of the common council, which attempted to exempt it, did invalidate the general taxes in the city upon other property.   In considering the question however, the general rule was stated to be, that " omissions of this character, arising from mistakes of fact, erroneous computations, or *errors of judgment* on the part of those to whom the execution of the taxing laws is entrusted, do not necessarily vitiate the whole tax."   On the trial of this case it was proved by the assessors that they omitted the railroad property because they believed that the law did not authorize them to insert it. And it was strenuously contended on the argument, that inasmuch, therefore, as the omission arose from a mere error of judgment on the part of the assessors, it fell within the rule just stated, and could not affect the validity of the taxes on other property.

I have struggled hard to bring my mind to this conclusion; for I have been desirous, if I could find any solid ground upon which to stand, to sustain the validity of these taxes.   But I confess that when the proposition was first stated, it seemed to me that it was extending the rule referred to, much farther than either reason or the authorities from which it was derived could possibly be held to warrant. And although I have given to it since the best reflection I was capable of bestowing, it has only confirmed my first impression.   It seems to me very clear that the rule in ques-

January Term,
1862.

KNEELAND
v.
CITY OF MIL-
WAUKEE et al.

tion assumes, as its foundation, that the taxing officers are attempting to execute a valid rule of taxation. When that is so, omissions arising from errors of judgment may not vitiate the whole tax, even though important in their character. But when the legislature prescribes an unconstitutional rule of taxation, and the taxing officers act according to that, to say that because they believed it to be valid, it was a mere error of judgment, and therefore the tax should be held legal, would seem to be giving to errors of judgment a greater efficacy than they have ever been supposed to possess. It would legalize a tax assessed in pursuance of an illegal rule. So that no matter how grossly any law might violate the constitutional rule of uniformity, a tax assessed according to it would be a valid, legal tax, provided the assessors believed the law to be valid. It seems unnecessary to enter into any further reasoning to show that the doctrine relied on cannot possibly be carried to such a length. And if this is so, it leaves the question here presented entirely similar to that in the Weeks case. There property of great value was omitted from the list by the illegal direction of the common council. Here the same thing was done by the unconstitutional, and therefore illegal, direction of the legislature. There was an equal want of authority in both cases to make the omission; the result upon the tax payers was the same in both. That result was, to impose upon them unjustly the burden which ought to have been borne by the property omitted. And that this must invalidate the taxes against them, would seem to follow necessarily, if any barriers whatever are to be maintained against illegal taxation. The strictness with which courts have required, where lands have been sold for taxes, that every requisite of the law, even, in many cases, as to the minutest matters of form, must have been complied with, is familiar to all. Can it be, in view of this doctrine, that such important matters of substance can be overlooked? Can it be that if the legislature should direct that one half of the taxable property of the state should pay a specific sum, which was a very small part of its just share, and that the remainder should be imposed on the other half, that such other half would be legally

taxed? Can the legislature say that the property of persons belonging to certain religious sects or political parties, shall be taxed at one-tenth the rate of others, and yet the tax assessed upon the others in pursuance of such a law be sustained? Upon the same principle by which this tax must be sustained, if at all, I do not see why such a result would not follow. But I think neither can be sustained without a total abandonment of all protection against illegal taxation.

Is there any good reason why this position should be taken—why the citizen should be given over, without remedy, to whatever oppression may be inflicted under the name of taxation, regardless of the safeguards which the constitution attempted to throw around him? For it is obvious that those safeguards are of no avail, if a tax assessed in violation of them is legal. The only reason by which such a position could possibly be justified, arises from the consequences that may result from holding otherwise. For taxes were assessed for several years, in those counties where there was railroad and plank road property, in pursuance of this unconstitutional rule. And it is said if their entire taxes for those years are held invalid, it may produce great public inconvenience. This is undoubtedly true. And yet it is obvious that if a judge is to answer upon the question of their legality, according to his conviction of the truth, arrived at by the principles of legal reasoning, he must answer it in the same way whether the consequences be one thing or another. If he would say it was illegal if it related only to a single school district, he must say the same though it relates to an entire county. If he would say it was illegal if it had occurred only in one year, he cannot say it would be legal because it was continued during five or six years. But if decisions are to be made according to the consequences that may result, then the latter facts would justify a change.

I suppose it is undisputed that the theory of judicial duty is, that while a judge may often, very properly, consider the consequences of a particular construction, in order to determine what was the intent and meaning of the law, yet that when he has arrived at a conviction upon that point, he

is bound to declare it, without regard to the consequences of
his decision.  I have no doubt this rule is often violated,
though perhaps many times unconsciously.   The temptation
to violate it is often very great.   The mind is apt to shrink
before the supposed disastrous results, and to take refuge in
some plausible pretext, which would otherwise have been
considered insufficient.   And so common has been the habit
of judicial legislation, that courts are too apt to assume, and
the profession too apt to criticise them upon the assumption,
that they have the power to declare the law as they think it
ought to be, rather than as they think it is.   For my own
part, I disclaim all such responsibility.   If these taxes were
assessed in violation of the constitution, the court which so
decides did not cause it, nor would it cause the inconvenien-
ces that might result from it.   I should therefore feel bound
to declare, without hesitation, my opinion, that the omission
of the railroad property in Milwaukee invalidated the taxes
of which the plaintiff complains, were it not for the fact that
the law authorizing such omission had, previously to the as-
sessment of those taxes, been once declared valid by this
court.   Of course, while that decision was in force, it was
the duty of taxing officers to recognize it as the law.   Yet,
it having been overruled, if the decision overruling it is to
be adhered to, I suppose its effect must be to invalidate
those taxes that were assessed according to the former.   For
if we now hold the law of 1854, taxing rail and plank roads,
unconstitutional, we must hold that it was so from the time
of its enactment.   If we hold that a tax assessed according
to it now is invalid, we must hold that every tax assessed
according to it, since its passage, is equally invalid.   And
in that, I understand, consists the difference between a change
of the decision of a court, and a change of the law by the
legislature.   The latter does not affect things happening be-
fore the change.   But when a court changes its decision, it
does so not because it has any power to change the law, but
because the law was from the beginning different from what
it had been held in the former decision.  And this, of course,
necessarily invalidates all things done under the former, the
validity of which depends on the former construction.   And

from these considerations the maxim "*stare decisis*" derives its chief support.

In view of them it was strongly urged by counsel in another case now pending, which presents this same question, that we ought to review our decision overruling the former decision of this court, and retracing our steps, ·hold the law taxing railroads to have been constitutional. 1 confess I have had great doubts, in view of the possible results of a consistent adherence to our last decision, whether our duty does not require us to take this· course. I freely admit that all these results were not at that time foreseen by me. The case in which our decision was made, was made up by the parties for the purpose of testing the question, how far the principle announced in the previous decision of *Knowlton vs. Supervisors of Rock County*, 9 Wis., 410, would be applied to the validity of the law taxing rail and plank roads. A speedy decision was desired and made, in order that the legislature, then in session, might take such action as might be deemed necessary. The former decision was relied on, but the principal objection urged against disturbing it was, that it would be a violation of faith towards those who had invested their capital in rail and plank roads, under the belief that they were to be taxed as provided in that law. No allusion was made to the possible effect of a change upon the validity of the taxes upon other property in those counties where railroad property was located. Had the invalidating of all those taxes been presented as one of the probable results of a change of decision, it would .have added very greatly ·to the force which I then believed the maxim "*stare decisis*" was entitled to. And though I never could have felt the slightest doubt of the incorrectness of the former decision, I might have felt bound to follow it. And it is not yet too late to return to it, if duty requires it to be done. I have thought much and anxiously upon this point, and I have come to the conclusion that the consequences of going backward may, after all, be more disastrous than those of going forward. The latter may produce some inconvenience and trouble in the re-adjustment of such taxes as may be found invalid during the few years when the law of 1854

was acted on. But that such re-adjustment is practicable and within the power of the legislature, I have no doubt. The case of *People vs. Seymour*, 16 Cal., 332, is a well con- sidered case sustaining this power, and the power is assumed to exist without question, in the opinion of CHRISTIANCY, J., in *Woodbridge vs. The City of Detroit*, 8 Mich., 311–12.

But if we go backward, we must say that particular classes of property may be taxed at less rates than others, and that the legislature may make whatever discrimination they please in the rates of taxation, provided only that each class is taxed alike. The evils and injustice to be appre- hended from this construction, were sufficiently pointed out in the former opinions upon this question. And our coun- try is now passing through an ordeal in which, I doubt not, those evils would be cruelly illustrated under that construc- tion, in responding to the immense amount of treasure de- manded from the loyal states to sustain the government in its mortal struggle. The small property owners who con- stitute the great mass of the people, usually pay their taxes without question, and seldom combine for the purpose of procuring any special privileges or exemptions. But capi- tal, always keen-eyed and vigilant, always equally ready to grasp at the profit and shrink from the burden,—often able to bring to bear powerful and dangerous combinations of influence upon legislative bodies—will be sure to take ad- vantage of such a construction of the constitution, and to shift upon others the burdens which itself ought to bear. True, such injustice may be borne for one year, or even for many years, without fully developing its fatal effects. But as the coral insects, though working almost imperceptibly, do in process of time erect islands and continents in the seas, so by an opposite process, unjust taxation, with a slow and steady destruction, eventually wastes the victims on whom it is inflicted. It was to guard against this that our consti- tution was framed as it is. And believing as I do, that a re- turn to a construction which virtually annuls its entire effi- ciency for that purpose, would be more disastrous than any inconvenience that would result from enforcing the obvious

January Term,
1862.

KNEELAND
v.
CITY OF MIL-
WAUKEE et al.

meaning of the instrument, I feel bound, for one, to stand upon our last decision.

It was argued by counsel in another case, that every tax assessed since the law of 1854, was necessarily illegal. It was said that if that law was void as a violation of the rule of uniformity, the law taxing other property must be equally so; because, being but parts of one whole, if one part violated the rule of uniformity, because it did not correspond with the other, the other must equally violate it, because it did not correspond with the one. I think this argument would be correct if applied to a law prescribing different modes of taxation in such language that if one mode were held invalid, it would leave no uniform system applicable to all taxable property. But where such a system would remain, I think the argument is not correct. Let me illustrate it. Suppose A, B and C to represent the different kinds of taxable property. If a law says that A shall be taxed at one rate, B at another, and C at a third, it is obvious that no valid tax could be assessed under such a law. If one part violated the rule of uniformity, so would each of the others. But if the law were first enacted, that all three should be taxed alike, and then afterwards another law should attempt to make an exception in regard to one, the exception being held void would leave the prior uniform rule undisturbed, and consequently valid. This was the case in respect to the law taxing railroads, and therefore the taxes assessed since that are not necessarily void for want of any valid law on the subject. Although it was not to be expected that the assessors would do so after the decision of this court to the contrary, yet according to our last decision, they should have taxed rail and plank road property under the general tax law; and had they done so, the tax would have been legal. It is the fact which is shown in this case, that they made their list according to the unconstitutional law, that renders it illegal.

One other question has been considered by us in consulting upon these cases. In the case of *Warden vs. The Supervisors, &c.*, 14 Wis., 618, and in the case of *Miltimore vs. The Supervisors, &c.*, ante, p. 9, we held that where a plaintiff

asked the aid of a court of equity to restrain a tax sale, and it appeared from his own showing that the tax was not oppressive, but on the contrary was less than he ought to pay, a court of equity would not aid him. The point is, whether the same doctrine can be applied to these cases. I do not see how it can, for the reason that these cases do not come within it. The plaintiff here does not show that he is taxed less than he ought to be, but more. He makes out a clear *prima facie* case of injury when he shows that a large amount of property, which ought to have helped him pay the tax, has been omitted entirely. And the only way by which the effect of this can be avoided, is to assume that the rail and plank roads paid their tax according to the law of 1854, and then to assume that by such payment they relieved the other property of an amount of state tax equal to the excess imposed on it by the omission of this kind of property in the tax lists. But I do not see how the court can possibly make either of these assumptions. We decided that the railroads were not bound to pay under the law of 1854; how then can we assume, without proof, that they did? But if we are to assume at all, I suppose we should assume as near to the truth as possible; and if so, we would be bound to assume that even if the railroad companies did pay according to that law, it was a much less sum than would have been their proportion of the taxes according to the general law. In all cases where the amount which any tax payer ought to pay has been or may be ascertained by any means within his reach, I think it would be eminently proper for a court of equity to refuse to relieve him from an illegal excess until he would pay what he ought. But in a case like the present, the exact amount which each tax payer ought to pay has never been legally ascertained, and can be ascertained only by a legal assessment of the tax. He can therefore only resist the illegal assessment. And when he has shown it to be illegal, and that an amount of tax has been imposed upon him which belonged upon others, I cannot see how the court can refuse to aid him upon the ground that he should first show what his tax would have been, if properly assessed, and whether he did not receive indirectly as much benefit

January Term, 1862.

KNEELAND
v.
CITY OF MILWAUKEE et al.

January Term, from the illegal collection of the one per cent. from the rail-
1862.
roads, as he suffered injury from their omission in the tax
KNEELAND lists. This would involve a legal assessment of the entire
v.
CITY OF MIL- tax, which of course could not be done by any plaintiff, so
WAUKEE et al.
that it would amount to a denial of any remedy.

For these reasons I am compelled to say that the taxes of
which the plaintiff complains were illegal, and that he was
entitled to the relief asked. I think the judgment should
be reversed, and the cause remanded with directions to enter
judgment for the plaintiff.

COLE, J. I think it logically and inevitably follows from
the decisions of this court in *Knowlton vs. Supervisors of Rock
County*, *The Attorney General vs. The Winnebago Lake & Fox
River Plank Road Co.*, and *Weeks vs. The City of Milwaukee*,
that the appellant is entitled to the relief demanded in his
complaint, on the ground that the taxes therein mentioned
are unconstitutional and void. It is true I did not concur
in the decisions in the two former cases, and my views upon
the question there decided remain unchanged ; but still, as-
suming the construction there given to be correct, I see no
possible escape from the conclusion above stated.

DIXON, C. J. I fully concur in the views expressed by
Justice PAINE, save that I cannot say that a consideration of
the consequences, just as they now appear, would have
changed my judgment in the former cases. Fully convinced
that those decisions are right, I think it would be most un-
wise and wrong to go back. I could not be prevailed upon
to do so for any reasons yet presented.

I furthermore think that undue significance is given to
what Justice PAINE supposes to have been the former decis-
ion of this court. I hold that the decisions of this court
cannot rest in tradition merely—that they cannot be drawn
into precedents, or become evidence of the law for subse-
quent cases, until they are reduced to writing and filed in
the case. The statute is peremptory upon this subject. By
section 9 of chap. 82, R. S. 1849 (found as sec. 11, chap. 115
of the present revision), it was provided : "The said court

shall give their decisions on all cases in writing, which shall be filed with the papers in the case; and the said court shall appoint some attorney to minute down and make report of all the principal matters in the cases, with the decision of the court." This was a matter which it was competent for the legislature to regulate, and I do not understand that it is the privilege of this court or its members, any more than of other officers or citizens, to disregard laws constitutionally enacted. The legislature has said that the decisions on *all* cases shall be in writing, and until they are so, though the judgments entered may bind the parties, they constitute no rule for future determinations. It is a fact mentioned in *Knowlton vs. The Supervisors*, &c., that no opinion or statement of the points decided in *Railroad Company vs. The Supervisors of Waukesha* was ever placed upon the files of this court. The statement of points published in the appendix to *Knowlton vs. The Supervisors*, was afterwards obtained, I believe, from one of the attorneys in the former case, and inserted by the reporter.

For these reasons I do not think the previous decision obligatory upon us.

On a motion for a rehearing, which was granted, the following opinions were filed:

DIXON, C. J. I think a rehearing must be had in this case. As to rail and plank road property, I am almost. and I cannot say but fully, prepared to return to the rule of taxation said to have been established by this court in 1855. I am in great doubt and perplexity upon the subject. My views of the constitution remain unchanged. I never had and never can have any doubt about that. I wish I could satisfy myself as well upon every question upon which it becomes my duty to give an opinion. As an original proposition, I should say without hesitation, that we must abide by the constitution as it is; that if it is to be modified, it must be done by the people. Neither the legislature nor this court have any power over it, either to change or dispense with its provisions.

---

*January Term,
1862.*

KNEELAND
v.
CITY OF MIL-
WAUKEE et al.

June 2.

January Term,
1862.

KNEELAND
v.
CITY OF MIL-
WAUKEE et al.

But the question is not new.   It was formerly before this court, and, we are told, decided differently—that the law taxing railroads and plank roads is no infringement of the constitution.   I say we are told this, because we have no authentic information to that effect.   The decision comes down to us by tradition.   No opinion was written, and no statement of the points resolved by the judges placed upon the files of this court.   And this, without intending to reflect on the official conduct of my predecessors, for whom I have the highest respect, I must say, was in my judgment the first great mistake.   The next may be that we departed from that decision—notwithstanding the law in that respect was not observed.   A question of such magnitude should not have been left in that way, and I have sometimes felt that we ought not to be bound by the adjudication as a precedent.   If the court had done its whole duty, written an opinion or filed notes of the points decided, I for one should never have departed from them.   But it is said that this should make no difference; that the consequences of overruling the decision at this time are as disastrous as if either or both these things had been done—that it was generally understood and acquiesced in as a final settlement of the question, and the legislation and all the financial matters of the state have been regulated accordingly.   It cannot be denied that this is so, and then the doctrine that we must stand by decided cases, and not disturb settled points, applies with peculiar and almost irresistible force.   It is urged upon this motion, and was in an oral argument recently made in another case presenting the same question.   The argument in this respect is new, for though it has occurred to us, it has not been before urged by counsel in the strong light in which it now appears.   The interests involved are immense, and the consequences of adhering to our late decision beyond calculation.   The taxes for a series of years in a great state like this cannot be annulled, and every proceeding connected with and depending upon them overturned, without a shock which must be felt by every property owner and citizen of the state.   The government itself must suffer great detriment and loss, and not only that, but all the counties

and many of the towns, to an extent amounting almost to complete financial ruin. Estates and titles acquired, and investments made, on the faith of a decision of the highest court of the state, will be swept away, and public confidence destroyed. When the embarrassments of the government will cease no one can tell. Years will pass away, and thousands upon thousands of dollars be expended in legislation, before the evils of such a sudden revolution can be fully known and appreciated. But this is not all. I do not see how the errors of the past are to be corrected except by the levy of a new tax to make up all former deficiencies. I have tried to persuade myself that a re-assessment and relevy of the taxes for those years was practicable, but I am satisfied it is not. The obstacles in the way of accomplishing such a scheme are so numerous, and the injustice which will be wrought in many cases so great, as in my judgment to preclude all possibility of its being done. We are then brought to this—the tax payers of to-day must come forward and pay into the public treasuries, state and county, and in many cases city and town, the unpaid taxes for the past seven years, with the fees, charges, and interest. This cannot be done. The people cannot discharge such an enormous burden, in any one year. Its collection would be impossible. It might be made in three, four, or more years, but not in a shorter time. Is this court authorized, in view of all the facts—can we consistently with duty, inflict such a burden upon the people of the state? I think not. It seems to me that as to the particular species of property in question before the court in 1855, I must return to the rule then established. As to the past it will be seen that the method I have suggested for supplying its defects—and I can see no other—carries us further and further from the rule of equality established by the constitution, for which I have struggled, and which I am still persuaded should be pursued by the legislature. It is better that those evils and inequalities should be endured, than that they should be corrected in this way. They have once received the sanction of this court, and the responsibility for them, be it great or small, rests not with me. The constitution was made for the safety and protection of the

people, and not to be used as an instrument for their destruction. *Communis error facit jus.* "Were the court now to decide that this construction is not to be supported, very great mischief would follow. And although, if it were now *res integra*, it might be very difficult to maintain such a construction, yet at this day the *argumentum ab inconvenienti* applies with great weight. We cannot shake a principle which in practice has so long and extensively prevailed. *If the practice originated in error, yet the error is now so common that it must have the force of law.*" *Rogers vs. Goodwin*, 2 Mass. R., 477. "It has been sometimes said," observes Lord ELLENBOROUGH, in *Isherwood vs. Oldknow*, 3 Maule & Sel., 396, "that *communis error facit jus*; but I say *communis opinio* is evidence of what the law is; not where it is an opinion merely speculative and theoretical, floating in the minds of persons, but where it has been made the *groundwork and substratum* of practice."

The error here, by long usage and the decisions of the court, has, as it were, been wrought into the texture of the constitution itself and become a part of it. It has so long constituted the ground work and subtratum of practice in all matters of taxation, and been so interwoven in all the financial affairs of the government and many of a private nature, that it would seem if ever there was a case where error should have the force of law, it is this. To overturn it now would be like overturning the constitution in any other respect where its construction has been deemed settled. It is fair to presume that the people, if an opportunity was afforded, would justify the interpretation, which has heretofore been given, rather than suffer from the mischiefs which would follow from overthrowing all the transactions of the past. Besides it is not as if we were fixing by our decision the future policy of the state, so long as the constitution remains unchanged. If we were binding the people or the legislature, to an unequal and unjust rule of taxation hereafter, the question would be of far greater moment. But we are not. Our views of the constitutional provision are well known, and the legislature can adopt them or not as it sees fit. There is, therefore, ample remedy for the future, and

the return, by legislative enactment, to the requirements of the fundamental law, will be easy and attended with none of these disastrous results. This, in my judgment, is a very important consideration, and one which should determine my action in the premises.

On the one side we 'have the blessings arising from an equal and uniform distribution of the burthens of government according to the benefits' received, founded in the broadest principles of equity and justice, and established by the constitution itself; on the other, the evils whilch will follow the overturning of all the financial affairs of the past seven years, of which I have given but a mere glimpse. As I have before said, my mind is in great perplexity and doubt, but upon the whole I can see no other way than to go back to the rule established by the court in 1855.

I make this full declaration of my views now, and without waiting for further argument, because of the urgent necessity for an immediate decision. The legislature is about to assemble, convened on this very business, and delay is impossible. Without this, I would not only have cheerfully listened to further discussion, but should have insisted upon it.

PAINE, J. Upon a motion for rehearing, counsel have pressed upon us with great force the argument derived from the maxim *stare decisis ;* and have urged that it was our duty to return to the first decision of this court, holding the law of 1854 valid.

I have admitted in the opinion already filed, that upon that point I had great doubt; and I was only able to sustain the conclusion there announced, by the fact that it seemed to me that the consequences of returning to that construction might be as disastrous as those of overturning it.

For although I believe, as I then held, that in originally determining what the law is, no court can properly disregard its real convictions in view of any consequences; yet in determining how far a court should ever feel at liberty to depart from a decision once made, the consequences of such

departure, depending upon the extent to which such decision has formed the basis of the business transactions of the community, must undoubtedly be looked at.

I have become satisfied that if we adhere to the decision already announced in this case, it will invalidate not only the taxes in those counties where there was rail and plank road property, but also the entire taxes of the state. For the omission of that property in the counties where it was located, necessarily disturbs the proportions as between them and the other counties in the state equalization.

Another case has also been argued, in which it was claimed that the principles of our decision must also invalidate the laws of 1860, professing to exempt railroads entirely, and then requiring them to pay a license. It is said that this is in substance the same thing as the law of 1854, under another name. And I am satisfied also that this is so. We cannot, while adhering to our decision in the case of *The State v. The W. L. & F. R. P. R. Co.*, sustain this legislation of 1860, unless we are prepared to say that the legislature may do that indirectly which it cannot do directly; that it may, by merely calling things by wrong names, sustain the most palpable evasion of a constitutional provision.

And although it may not be impossible to re-adjust the taxes for all these years, it would undoubtedly be exceedingly difficult, and even if accomplished would involve very great labor and expense. And it does not seem very probable that upon a single trial a re-adjustment could be hit upon, which would anticipate and avoid all the questions and objections that might be raised. I have become fully convinced, therefore, that no court can be justified in adhering to a departure from a decision once made upon the construction of a constitutional provision, where such departure must uproot so extensively both the public and private business transactions of the state. It is no justification to demonstrate that the first decision was incorrect. If it were, I think we should have such justification here. For, that a rule taxing different kinds of property at different rates, is not a uniform rule, has always seemed to me a proposition too plain for argument. But a proposition appears plain to one

mind, and its converse equally plain to another. Experi-
ence teaches the necessity of recognizing this fact, and the
philosophy of the law, which requires that rules of property,
once settled by judicial decision, shall not be disturbed, is
founded upon it.    The question in such cases is not whether
the first decision was correct, but whether a decision has been
made, and business conducted on the faith of it.    When this
has been done, it would be difficult to imagine a case, where
a court would be justified in re-opening the question that
had been decided.    There must be an end somewhere.
"The world waits and listens for the judicial determination,
and then acts accordingly."    Men have the right to rely
with certainty upon the decision of the highest tribunal in
the state, in matters where their business is to be regulated
by such decision.    And when they have so acted, the idea
that all their transactions may be uprooted, whenever new
judges come upon the bench, who believe the former decis-
ion to have been very wrong, could not be tolerated in any
system.    We have ourselves decided the present method of
taxing banks to be valid.    Whether that decision was right
or wrong, could it be allowed that years hence other judges,
holding a different opinion, should overrule it, and invali-
date the entire taxation of the state, because bank property
was not taxed like the rest?    Obviously not.    Judicial de-
terminations would lose all value, and nothing could ever be
regarded settled upon such a theory.    And although I sin-
cerely regret that a decision which I am compelled to regard
as a subversion of an important safeguard of the constitu-
tion, was ever made, yet in view of the destruction which it
now appears must result from a departure from it, in obedi-
ence to the rule of judicial order, I feel it my duty to return
to, and follow, though I cannot defend it.

It may be, as argued by counsel, that this will not neces-
sarily lead to the recognition of the same principle in new
legislation upon other subjects—that it may be held bind-
ing, so far as it actually decided, but not held as establishing
a principle to be applied to new cases.    But that is not now
to be determined.

The reasons which induced the judges now constituting

a majority of the court, to feel that they were not obliged to regard that decision, as they would one in which the court had filed an opinion, have been already sufficiently stated in other opinions. But notwithstanding we have not the reasons of the court, we know that upon some ground they sustained the law of 1854, and we know that all the taxation of the state and all the private transactions growing out of it, have since been conducted on the theory of its validity. Upon this ground alone is that decision entitled to be regarded as an authority, but this alone is sufficient to make it imperative.

I am satisfied that the decision in the case of *The State v. The Win. Lake & Fox R. P. R. Co.* should be overruled, and the law of 1854 held valid, and that the motion for a rehearing in this case should be granted.