IN THE

# SUPREME COURT

## OF THE

# STATE OF WISCONSIN.

———o———

## DEAN VS. GLEASON, Treasurer, &c.

The ruling in *Kneeland vs. City of Milwaukee*, 15 Wis., 454, as to the constitution-
ality of the law taxing railroad companies a per cent. upon their gross earnings,
followed in this case.

In making the assessment roll of the city of Madison, large amounts of personal
property were omitted, which a very little diligence would have enabled the as-
sessors to reach, and there were many errors and inequalities in the valuation
of real estate, which it seemed hardly possible for men of ordinary intelligence,
acting under oath, to have committed; yet, as it could not be said, upon the
whole evidence, that these errors resulted from anything but want of judg-
ment and lack of diligence and business habits, it was *held*, in a suit to enjoin
the sale of real estate for the taxes levied upon such assessment, that such er-
rors did not invalidate the whole tax, and that the only remedy for such griev-
ances is in the election of more diligent and competent officers.

The Charter of the City of Madison provided that the "assessors" should make
out the assessment roll by wards, showing the taxable property of each ward
separately, and that opposite each parcel of property should be affixed the value
thereof, &c. The assessor for each ward made out the list of property for his
ward, and affixed *his* valuation; but the several assessors afterwards came to-
gether as a body, and compared their several lists, and agreed upon the cor-
rectness of the whole. *Held*, that the charter was substantially complied with.

One section of the charter directed that opposite to each parcel of property on

VOL. XVI—1

the assessment roll, should be placed "its value," but a subsequent section declared that "all lands lying within the city limits used or kept for farming purposes, and not divided and laid out into lots, and all out-lots not subdivided, &c., shall be assessed at a moderate cash value by the acre." *Held*, that it is not sufficiently certain that these sections do provide for different rules of taxation to justify the court in saying that they violate the constitution.

The charter of the city approved March 4th, 1856, provided that the first election should be held on the "first Monday of March next," and that no resolution levying a tax should be adopted except by a vote of two-thirds of the aldermen. The charter was not published so as to become a law until December of that year, but an election for twelve aldermen was held on the first Monday of March, 1856, and certain persons then chosen as aldermen for two years continued to act as aldermen during the year 1857, and constituted a portion of the eight aldermen who voted for the resolution levying the tax of that year. *Held*, that the persons so chosen at the election in March, 1856, were at least officers *de facto*, and their acts in the premises could not be avoided by any objection to the legality of their election.

An agreement among the assessors of a district that they will assess all property at about one-third its value, if faithfully carried out, works no injustice to the tax payers of the district, and furnishes no reason why equity should interpose to restrain the collection of the tax.

If the tax assessed against a man is no more than he ought to pay, even though there should be some defect in the proceedings which might render it invalid by the strict rules of law, there is no reason why equity should interpose its extraordinary power in his behalf.

APPEAL from the County Court of *Dane* County.

This was an action to restrain the treasurer of Dane county from selling certain real estate of the plaintiff, in the city of Madison, for the taxes for the year 1857. The objections made by the plaintiff to the validity of the taxes were: 1. That the assessors of said city did not, nor did a majority of them, assess any of the taxable property in the city for that year; nor did they meet on the days appointed by law at the common council room in said city to hear objections of parties who deemed themselves aggrieved by the assessment of their property, at which times and place the plaintiff did appear to make his objections. 2. That after the pretended assessment rolls of the wards of said city had been filed with the city clerk and approved as hereinafter stated, material interlineations and erasures were made in them, as to real estate, with-

out any authority whatever; and that the property described in the tax list or duplicate for that year, and upon which the tax for that year was pretended to be levied, did not corres- .pond with and was not the whole and same property as that described in the assessment rolls for said year, and also that a large amount of personal property of the value of over $20,000 assessed to divers persons in said ward assessment rolls was omitted from the said tax list or duplicate, by reason of which the taxes charged against the plaintiff's property were greatly increased.   3. That the common council for said year was com- posed of twelve aldermen and the mayor, and said council did not on the 1st Monday of July, or at any other time, determine the amount of taxes to be levied that year for general city pur poses, nor for school purposes, nor levy any specified amount as a tax for either of said purposes, but, by a vote of only eight members of said council, passed on the 14th of July, 1857, a resolution " that a tax of six per cent. be levied on the assess- ment roll returned by the assessors," without designating for what purpose the same was levied, or designating any amount for any named purpose, general or special.   4. That the treas- urer of the city did not, on or before the 7th of July, 1858, re- turn to the treasurer of Dane county a list of the lots on which the taxes for 1857 remained unpaid.   5. That the pretended assessment of taxable property in said city was not uniform, but widely different from the real value in cash, some parcels being assessed at or about their real value, and others at not more than one-fifth of such value; and that such instances are numerous and so patent that any of the assessors must have known the facts if they had examined the several parcels of property, and if they did so examine them, their respective val- uations were made thus disproportionate intentionally and cor- ruptly, to the great injury of the plaintiff.   The complaint here specifies over sixty pieces of property which are placed on the assessment roll at an aggregate valuation of about $50,000, and which it alleges should have been valued at over $280,000.   It

then avers that such non-uniform assessments were directed by the 21st section of the charter of the city. 6. That there was no assessment roll of said city for the year 1857, but " instead thereof, there was an assessment roll in form for each of the four wards, to each of which, three of the four assessors certified in the form hereinafter stated, without personal knowledge of the facts certified. The complaint then designates property of the assessed value of over $55,000, which was returned in the ward assessment rolls but was not put down in the tax list and was not taxed, and names divers persons who should have been assessed for personal estate over $200,000 but who were not assessed therefor at all. 8. That real estate in said city, of the value of $95,000, belonging to the " Milwaukee & Mississippi Railroad Company," was not assessed nor taxed. 9. That the taxes for the year 1857 were apportioned upon the assessed valuation, and not upon the " corrected " assessed valuation of the property, which largely increased the amount of tax charged against the plaintiff's real estate, the "corrected " assessed valuation being $117,986 less than the assessed valuation, and the pretended city tax being six per cent. *in solido* on the valuation, and not a specified sum to be apportioned on the valuation; the corrected valuation of the plaintiff's real estate being $7,560 less than the assessed valuation thereof, and by making out the tax upon the latter valuation the plaintiff was charged with $453.60 more taxes than he otherwise would have been. 10. That the only thing in the nature of an assessment roll for the year 1857 was the aforesaid ward assessments, neither of which purports to embrace the property of the whole city, but that of one ward only, to three of which is annexed a certificate signed by the four assessors certifying that it contains all the real and personal estate in the ward therein mentioned liable to taxation, so far as they had been able to ascertain, and that they had equalized and estimated the same at its cash value according to their best judgment, &c., and the certificate to the other assessment roll is in the

same form except that it erroneously declares that said roll contains all the real and personal estate in the four wards. 11. That the amount of taxes, other than city taxes, required to be levied in said city for the year 1857 was $10,857.84, whereas the total amount carried out on the tax list was $11,570.24. 12. That in making out the tax for state, county, school and county poor purposes upon the valuation contained in the assessment rolls, the same was calculated at too high rates per cent., so as to produce an excess of $873.31. 13. That in more than forty instances specified in the complaint, the city clerk, in making out the tax list, carried out the tax on less than the assessed valuation. 14. That the under-valuation referred to in the 5th objection, and the property which after being assessed was omitted from the tax list, and the personal property liable to taxation but not assessed, and the railroad property not assessed, amounted to the sum of $623,838; but for which errors and omissions the taxes on the plaintiff's real estate would have been one-third less than they are in said tax list. 15. That four of the persons who acted as aldermen of said city in the year 1857, were not chosen after the charter of said city was a law, but claimed to be such officers under a pretended election held on the 7th of March, 1856, and before the charter was published.

On the trial, the plaintiff's witnesses designated some seventy pieces of property in the city, belonging to different tax payers, which were put down in the assessment roll for 1857, at an aggregate valuation of about $50,000, but which were worth, as property rated at that time, about $280,000. They also named divers persons in the city, whose personal property subject to taxation in that year was worth between $100,000 and $150,000, who were not assessed or taxed therefor, and many of whom testified that they were not called upon by the assessors to report their personalty for taxation. It was proved also that real estate within the city belonging to the Milwaukee and Mississippi railroad company, of the value of $95,000,

was entirely omitted from the assessment roll and tax list for the year 1857. Francis Ritchie, who was the assessor for the 4th ward, was called by the plaintiff, and testified that he examined the property in that ward to ascertain its value, and put it down in the assessment; that no other person was with him or took part in it; that at the time the rolls were made for the other wards, he did not assist in making the valuation or in putting the property down in the list; that he understood at the time the assessment was made, that property belonging to the railroad company was exempt from taxation, except a per cent. on gross earnings; that in making the assessment, he complied, as near as he knew how, with the city charter; that he signed the certificate at the end of each of the rolls; that the assessors met according to the charter, sat two days—certainly one—and looked over the rolls generally, and came to the conclusion that they were about equal, fair and right; that he did not know how the value of the property in the other wards was fixed in the first place; that he endeavored to assess fairly and equally all property in his ward not exempt from taxation; that the valuation of all the property in all the wards was satisfactory to his judgment; that the others assented to and approved of that valuation; that the assessments were first made by the several ward assessors and then they met to review them and hear grievances, and at the end of the meeting they signed the certificates at the end of the rolls; that he supposed at the time that he had assessed all the personal property liable to taxation belonging to the residents of that ward; that he faithfully endeavored to find all personal estate liable to assessment, and inquired of a large number of the inhabitants as to their personal property, but did not remember of inquiring in regard to their money at interest, and did not examine the record of mortgages in the county; that the meetings of the assessors to hear grievances were on the days fixed by the charter; that Mr. Burdick was present at one of the meetings; that he did not know that all

the assessors were present at that time, but was positive that three of them were ; that the assessed valuation was one-third less, and perhaps more than one-third less than the prices at which property was held and rated ; that he made an alteration in the assessment of two lots, upon the complaint of Mr. Burdick ; that he did not remember to have taken particular notice of the valuation of any piece of property in any of the wards except his own ; they merely looked over the assessment rolls.

Mr. Burdick testified that he attended at the council chamber on the days fixed by the charter ; spent the greater portion of the first day and nearly all the second trying to find the board together, being satisfied that some important corrections should be made ; that during the second day he saw three of the assessors there, but did not to his knowledge see the assessor of the first ward, and was positive he could not have been there, during business hours, one hour of either day ; made quite a number of complaints, not to three men together, for he could find no two of them to listen to him together ; that he made a memorandum of several items on the assessment rolls and subsequently on a sheet of paper ; made quite an effort to get their attention, but could not get them in shape to hear him ; made a memorandum on the forenoon of the second day of all he intended at the time to complain of ; made it because he thought the assessors did not intend to give him an opportunity to be heard ; thought he handed it to one of the assessors for the purpose of having the desired alterations made ; was not in the council chamber all the business hours of both days, and could not swear that all the assessors were not together at any one time, but there were not any sixty consecutive minutes during business hours of the two days, when he was not present ; thought the certificates were not appended to the rolls when he saw them.

The plaintiff, as a witness on his own behalf, testified that he went to the council chamber some eight or ten times during

business hours of the first day appointed for the assessors to meet, but could not say that he went on the second day; his object in going was to get the assessment on block 104 changed; it had been unequal for two or three years; he did not see more than two of the assessors there at any one time; he did not find them organized during the day; asked when they would be organized, and Oakley said he would step into his office (which was on the same floor, three doors from the council room), and tell him if they were organized; he did not see assessors Ritchie or Needham when he was at the council room; he thought he spoke to Oakley of other property, of the assessment of which witness complained; block 104 was not assessed more than it was worth, but the assessment was unequal as compared with other property; he did not remember that any of the property was assessed more than it was worth, but the complaint was on the ground of inequality; some of his property was assessed higher in proportion than other property.

It was shown that the treasurer of the city did not make return to the county treasurer, of the lands and city lots which were delinquent in the payment of taxes, until the 27th of July, 1858. The original assessment rolls and the original tax list for the year 1857 were put in evidence, and were ordered to be returned to the supreme court, in case of an appeal, as part of the record; but they are not now on file in this court. The resolution of the common council levying a tax of six per cent. on the assessment roll as returned by the assessors, was put in evidence, and was shown to have been passed at a meeting when the mayor and nine aldermen only were present, of whom eight, including N. B. Van Slyke and A. E. Brooks voted in the affirmative, and the other in the negative. It was shown also, that Van Slyke and Brooks were elected as aldermen of the city on the tenth of March, 1856, for two years, and were not either of them elected as such in the spring of 1857, but acted as aldermen through the whole of that year.

On the part of the defendant, Mr. Ott, the assessor of the 3d ward, testified that the assessors for the different wards met at the council chamber on the days named in the charter, to review the assessment and hear grievances ; that he believed all the assessors were present on both days, and knew they were on one of the days, but could not say how long ; thought the certificates at the end of the rolls were signed on the last day, when they got through ; thought the first and third wards were assessed a little higher than the others, but supposed it was pretty fair ; they signed the certificates because they had assessed the property according to their best judgment ; did not think that he interfered with the assessments in the other wards, but looked them all over ; did not find any property assessed too high, but rather some of it too low ; the other assessors said they knew the property in their wards better than he did, and it was about right, and so he yielded his opinion to theirs, and agreed to it ; he did not go with the assessors in the other wards, or make any examination of the property in them ; the first thing they did when the assessors met, was to exchange their assessment rolls and ask each other to examine them and say what each thought of the others' assessments ; he assessed the property in his ward alone, no other assisting him ; assessed the value of merchants' stocks upon his own examination ; inquired of brokers their capital, and assessed some by what they reported, and some by what other brokers said and what the register of deeds told him of mortgages recorded in his office ; inquired of persons the amount of debts due them from solvent debtors, but most of them refused to answer ; when the assessors first met after their election, they agreed to take the roll of each ward for the previous year in making their assessment ; they agreed to go by the same valuation as the year before so as to get it all equal, and if any alteration or improvement was made they would change it and make it right ; he made changes in the assessment of his ward when he found it necessary, and in making the assessment complied with the

provisions of the city charter to the best of his ability; farming lands and out-lots were assessed by him lower than the city lots, and at less than one-third their rated value, because they were so distant from the city; he understood the charter to say that farming lands should not be assessed as high as other real property, and that was the reason he assessed them lower; he commenced near the capitol square, where property was most valuable, and went out decreasing the valuation until he got to the city limits; he adopted no different rule in assessing the property on the east side of the Catfish, not laid off into lots, from what he used in assessing the property across the street laid out into lots and not used, except as one was more valuable than the other, and did not assess school houses or church property, because he understood the law exempted them from taxation. On cross-examination he testified that he did not mean to say that he assessed out-lots and farming lands at less than one-third of their value; he assessed property near the capital square at one-third of its value because they agreed to follow the old assessment, which was at about that rate; they thought it would make no difference whether it was one-third or two-thirds, if they made it equal. Mr. Oakley, who was assessor for the second ward, testified that in his ward he thought the assessed value was about one-third of the rated value, and that he did not adopt any different rule in assessing farming lands and out-lots from that followed in regard to other real estate, except as the former were less valuable; and that in making the assessment he complied with the charter to the best of his ability. Mr. Needham, assessor for the first ward, testified that in his ward the assessed value was about two-thirds of the rated value; that he did not assess farming lands and out-lots as high as city lots; he intended to follow the 22d section of chapter 7 of the charter in his assessment and to comply with all the provisions of the charter; he did not assess farming lands and out-lots by the acre, but intended to assess the land referred to in the assessment roll at

a moderate cash value. In other respects the testimony of the two witnesses was substantially the same as that of Mr. Ott. N. B. Van Slyke testified that he was acquainted with the value of real estate in Madison in 1857, and had examined the assessment rolls for that year, and that improved property was assessed at about one-fifth or one-sixth of its value, and unimproved, at about one-fourth or one-fifth of its rated value—in some instances not one-sixth.

The plaintiff was called by the defendant, and testified that his personal property in the year 1857 was $4,000 or $5,000, about half of which was mortgages and the rest was furniture, horses, carriages and farming utensils, the most of which were in the town of of Blooming Grove; and that none of the assessors of the city of Madison called on him that year to give in his personalty for taxation. James Richardson and E. M. Williamson testified that they had been real estate agents and were well acquainted with the value of real estate in Madison in 1857, and they presented a list of the plaintiff's real estate in the city, and in one column the values of said property as rated in that year, and in another the values at which they were assessed, showing that the rated value was $100,350.00, and the assessed value $36,348.00.

The county judge found the facts substantially as alleged in the complaint; and, as a conclusion of law, held that the taxes levied upon the property of the plaintiff described in the complaint were inequitable, against law, and void, and that the same should be set aside and annulled; that said property and every parcel thereof should be adjudged relieved of the apparent lien created by said pretended taxes and tax proceedings; and that the defendant and his successors should be forever enjoined from selling said property for said pretended delinquent taxes.—Judgment accordingly.

*S. U. Pinney*, for appellant:

1. A court of equity will not enjoin the collection of a tax on account of *irregularities*, when there is nothing in the case

to show that the party has been or will be *aggrieved* by them. *Mills v. Gleason*, 11 Wis., 497; *Page v. City of St. Louis*, 20 Mo., 137; Charter of Madison, chap. 7, sec. 22; 12 Ill., 34; 4 Kern., 545; 2 Gibbs, 484; *Weeks v. City of Milwaukee*, 10 Wis., 242; *Warden v. Supervisors of La Fayette County*, 14 Wis., 618; *Kellogg v. City of Oshkosh*, id., 623. 2. If any of the matters complained of were the result of mere mistakes or error of judgment, whether in respect to law or fact, however much the plaintiff may have been injured by it, he cannot obtain the relief demanded,—the several officers having acted in good faith and honestly endeavored to discharge their duties according to law. 10 Wis., 242; 11 id., 1; *Williams v. School District*, 21 Pick., 75; *Watson v. Inhabitants*, &c., 4 Met., 599; *George v. School District*, 6 id., 512; *Spear v. Town of* &c., 26 Vt., 414; *Ins. Co. v. Yard*, 17 Pa. St., 331. If the officers err in judgment and act in a manner prejudicial to their constituents, the remedy consists in the choice of better officers. 4 Met., 599. 3. The evidence shows that after each assessor had assessed the property in his ward, they all concluded that the assessment thus made was equal and fair, and certified it as such. This was the result of their *joint* action and judgment. They met also to hear grievances according to law, and the tax payers had their day before the assessors. If they do not avail themselves of such opportunity they are concluded. In this case the plaintiff did improve that opportunity to the fullest extent. *Howe v. City of Boston*, 7 Cush., 273; *Lincoln v. Worcester*, 8 id., 55; *Exchange Bank v. Hines*, 3 Ohio St., 35. 4. The failure of the city clerk to make return of delinquent lands by the time named in the statute did not render the tax void. *Mills v. Gleason*, 11 Wis., 497. 5. If the charter provides for a different rule for assessing farming lands and out-lots from that for assessing city lots, the evidence shows that the assessors did not in fact make any discrimination. 6. The four aldermen elected in March, 1856, for two years, were officers *de facto*, and their acts cannot be impeached in this collateral

way. *State v. Williams*, 5 Wis., 308; *In re Bridget Boyle*, 9 id., 264; *Fowler v. Beebe*, 9 Mass., 231; 21 Pick., 75; *Coolidge v. Brigham*, 1 Allen, 333; id., 558; 18 Mass., 180. 7. It is conceded in the complaint that at least two-thirds of the amount charged against the plaintiff's lots would have been a proper and equitable tax; and the plaintiff should have offered in his complaint to pay what was equitably due.

*J. H. Knowlton*, for respondent:

The charter of Madison not having become a law until December 3, 1856, when it was first published, there was no law until that day creating the office of alderman. Going through the form of an election for aldermen before the office was created, was a void proceeding. To constitute a person an officer *de facto* it is requisite (1.) That there be by law such an office as the incumbent claims to hold. (2.) That at the time of his accession to office some other officer had authority by law to appoint some person to the office claimed, or that certain electors had authority by law to hold an election and elect some person to that office. (3.) That such appointment was in form made, or such election in form held. (4.) That in the appointment, election or qualification of the incumbent, some error has intervened or ineligibility existed, for which he would be ousted from the office by direct proceedings against him. Neither the first or second requisite existed in this case as to aldermen Van Slyke and Brooks, who were elected nearly ten months before the office was created. By the charter no election was to be held under it until March, 1857. The charter provides that the council shall consist of a mayor and twelve aldermen, and that to levy a tax for school purposes or general city purposes, an affirmative vote of two-thirds of the aldermen must be had on the resolution. Only six besides Brooks and Van Slyke voted for the resolution to levy the tax in question. In law, no city tax was levied. *Clark v. City of Janesville*, 10 Wis., 136. 2. The provision of the charter as to the rule of assessments is unconstitutional, in that it directs that the great

mass of the property shall be assessed at its full cash value, and that certain other property shall be assessed at a *moderate* cash value. *Knowlton v. Supervisors*, &c., 9 Wis., 410. The property of the plaintiff was all of the description which had to be assessed at its full value. The assessors complied with no law. They started out with an agreement between themselves that they would assess property at one-third of its value ; but they violated that agreement in very numerous instances. 3. The intentional omission of the real estate belonging to the railroad company vitiates the assessment. 4. The taxes are void because not carried out on any assessment authorized to be made. By the charter the assessment was required to be made by the *assessors*, of whom there were four. Three being a majority, no less number than that could make an assessment. They must all exercise their judgment in the matter, and their minds must meet. It is not enough that three look over the assessment made by one, and then sign a certificate that the assessment was the act and judgment of all four. The certificates are proved to be false in this respect.

*Julius T. Clark*, on the same side, as to the neglect of the assessors to act conjointly, cited Blackwell on Tax Titles, 135 et seq. ; *Doty v. Hope*, 3 Denio, 594 ; *Ex parte Balt. Turnp. Co.*, 5 Bin., 481 ; *Kinney v. Doe*, 8 Blackf., 350 ; *Powell v. Tuttle*, 3 Coms., 396 ; *Middletown v. Berlin*, 18 Conn., 189. Upwards of $360,000 of personal property, and $95,000 of real estate, was omitted by the assessors. As to the real estate, the omission was intentional ; as to the personal, there is not offered a decent pretence of excuse. 2. As to the neglect of the city treasurer to make return of delinquent lands in time, counsel cited from Blackwell : "A neglect to make the return in the form, manner and time prescribed, is fatal to the validity of the tax sale." If so, it is a good ground for enjoining the sale. 4 Wis., 454 ; 6 id., 680 ; 8 id., 485 ; 9 id., 402, 406, 310 ; 10 id., 242, 270. As to the maxim that he who asks equity should do equity, it will not do to say that a man should pay his just

proportion of a tax illegally imposed, when he has no power, natural or legal, to determine what his just proportion may be, without exercising in his own behalf the offices of the assessor and the various other persons charged with the duty of executing the law for the collection of taxes.

*By the Court,* PAINE, J. This suit was brought to restrain the sale of the plaintiff's lands for taxes. The decision granting the motion for a rehearing in the case of *Kneeland v. The City of Milwaukee,* 15 Wis., 454, disposes of the objection based upon the omission of railroad property in the assessment roll.

The plaintiff urges a number of other objections, which it is necessary to notice. It is claimed, and the proof shows it to be true, that there was great neglect and inaccuracy on the part of the assessors in making up the tax list. Many men of wealth, with large amounts of personal property, were not called on at all to furnish lists of it, and considerable amounts were thus omitted which ought to have been inserted, and which a very little diligence on the part of the assessors would have enabled them to reach. There were also many errors and inequalities shown in the valuation of real estate, which it would seem hardly possible for men of ordinary intelligence, acting under the obligation of an oath, to have committed. Yet it cannot be said, upon the whole evidence, that these things resulted from anything except errors of judgment and lack of diligence and thorough business habits on the part of those officers. It cannot be admitted that such defects shall invalidate the entire taxes. If they did, it would be useless to attempt to collect any tax. For although there probably have been very few lists that were so full of this kind of errors, as the one now under consideration, yet there doubtless have been still fewer which were entirely free from such errors. As a matter of sheer necessity the inequalities resulting from such defects must be endured. The only remedy is in the election

of more diligent and competent officers.    *Weeks v. Milwaukee*, 10 Wis., 242.

It is further claimed that the charter required the assessment list to be made by the assessors as a body, and not separate lists to be made for each ward by the separate assessors, each acting alone.    This may be conceded as matter of law, and yet we think the charter was substantially complied with.    It is true, the assessor for each ward made out in the first place the list of property in that ward and affixed his valuation.    But they then came together as a body, and compared their several lists and agreed upon the correctness of the whole.    The assessors, as a body, passed judgment upon the entire list, made up of the several ward lists, and this was all that the charter required.    For it cannot be said that it was intended imperatively to require that there should be no division of the mechanical labor of making up the list, and that the entire board, or at least a majority of them, should actually assist in writing down and valuing every item at the very outset.    It must be sufficient if, before the completion of the list, the assessors, as a body, exercise their judgment upon the entire list, and agree to its correctness, and that was done here.

It is said also, that the assessors did not meet to hear objections as the charter requires.    But we think this is not true in point of fact.    The assessors testify that they did meet, and the most that could be said from the plaintiff's evidence is that they were not all present during some portions of the time.

Another objection is that the charter itself is unconstitutional, for the reason that it does not provide a uniform rule for taxing real estate and therefore is void under the decision in *Knowlton vs. The Supervisors of Rock Co.*, 9 Wis., 410.    This objection is founded upon sec. 21, chap. 7, of the charter (Laws of 1856, p. 106), which provides that lands used for farming purposes and not divided into lots and blocks, and all out lots not subdivided &c., shall be assessed at a moderate cash value by the acre.    It is said that the legislature intended by

this language, that a different rule should be adopted in assessing the value of such lands from that applied to other lands which were required to be assessed at their value. It is difficult to resist the conviction that such was their intention, and yet it may be doubted, whether the language used, is not too indefinite and uncertain to authorize a court to say that it amounts to a violation of the constitutional rule of uniformity. If there is a difference between the value and the moderate cash value of property, it is difficult to define what that difference is. And perhaps a law ought not to be held to conflict with the constitution, unless the language used is sufficiently certain to enable the court to say, that it does provide two different rules of taxation. I suppose the meaning of "a moderate cash value," is a medium cash value, that is neither the highest or lowest cash valuation, but between the two. And this would be precisely where I should suppose it to be the duty of an assessor to fix it, under a statute requiring him to assess the property at its value. I concede that it is difficult to account for the enactment of this section at all, except upon the theory that the legislature intended to make some difference between these kinds of lands and others. Yet I cannot say that the language used requires any different valuation, from that which the assessors ought to put upon all property under the charter. I cannot say therefore that the constitution is violated. And although some of the assessors testified that they endeavored to follow the charter, and that they understood that the charter made a difference between these lands and city lots, yet it appears on their cross-examination that the only difference which they supposed to exist, was in the actual difference of value, arising from the greater distance of the farming lands and out lots from the centre of business. And they testified that they assessed all property at a moderate cash value, so that the rule upon which they acted, was in fact a uniform rule.

Another objection is that a portion of the council who voted to levy this tax were not aldermen, for the reason that at the

time of their election, the city charter was not in force for want of publication. Whether that was so or not, the charter was in force long before the levy of this tax, and those officers were at least officers *de facto*, and their acts cannot be avoided by any objection to the legality of their election. *In re Boyle*, 9 Wis., 264.

It is further objected that the assessors, before making their lists, agreed to follow the assessment roll of the previous year, in which property was rated at about one-third of its value. It is a notorious fact that this has been the common practice of assessors in this State; and that property has usually been assessed in tax lists, at less than half of the value at which it would generally be estimated. Whether such a practice can be sustained in point of strict law, we shall not now determine. But we think it a sufficient answer to an application for equitable aid, to say, that such an understanding on the part of the assessors, works no injustice to the tax payers of their district, assuming it to be faithfully carried out. It might operate to the injury of other taxing districts, by diminishing the aggregate valuation of the district where it was adopted, provided property in other districts, was assessed at its full value. But perhaps the only remedy for inequalities growing out of such a practice by assessors, is in the equalization by the state and county boards. But it is clear that such a practice works no injury to any individual in the district where it is adopted. His property bears the same proportion to the other taxable property, that it would if all were assessed at its full value, so that his tax is not affected by it. He is therefore suffering no wrong. He is called upon to pay only such a sum as he ought to pay. There is therefore no reason why equity should interfere to relieve him. Courts of equity do not call their powers into exercise, to relieve against every illegality. It is well settled that they will not interfere against judgments at law, which have been wrongfully or even fraudulently obtained, unless the plaintiff can say something against the real justice of the

judgment. *Stokes v. Knarr*, 11 Wis., 389; *Ableman v. Roth*, 12 Wis., 81. And this court has, I think, with the clearest reason, lately applied the same principle to questions of taxation. Every citizen is under the strongest obligations, to pay his just share of the public revenues. If, therefore, the tax has been assessed against him, and is no more than he ought to pay, even though there should be some defect in the pro. ceedings which might render them invalid by the strict rules of law, there is no reason why equity should interpose its extraordinary power in his behalf. *Warden v. Supervisors of La Fayette Co.*, 14 Wis., 618; *Mills v. Johnson*, decided at this term.

The judgment is reversed, with costs, and the cause remanded with directions to dismiss the complaint.