Hixon and others vs. Oneida County and another.

Hixon and others, Appellants, vs. ONEIDA COUNTY and another, Respondents.

Hixon and others, Respondents, vs. ONEIDA COUNTY and another, Appellants.

*March 25 — June 15, 1892.*

TAXATION: EQUITY. *(1) Waiver of appeal by perfecting judgment. (2) Parties: Purchaser of tax certificates pendente lite. (3) When collection of taxes will be enjoined. (4) Undervaluation by assessor: Evidence. (5–7) Board of review: Incompetent evidence: Outsider acting as clerk: Records. (8) Assessment and tax roll: Description of property. (9) County apportionment. (10) Bridges: Notice of submission of question as to tax. (11) School estimates: Separate vote. (12) Towns: Power to raise money for cemetery purposes. (13) Division of towns: Apportionment of indebtedness: Levy of tax.*

1. In an action to restrain the collection of taxes the trial court held that a part only of the taxes were invalid, and that plaintiffs were entitled to judgment only upon condition that they pay into court the amount of the valid taxes. Plaintiffs paid said amount into court under protest, and perfected the judgment. *Held,* that they did not thereby waive the right to appeal from such judgment. *Webster-Glover L. & M. Co. v. St. Croix Co.* 71 Wis. 317, distinguished.

2. In an action against a county to restrain the collection of taxes on lands a preliminary injunction was dissolved, and the lands were afterwards sold for the taxes and the certificates of sale were assigned by the county. *Held,* that the assignee of such certificates, being a purchaser *pendente lite,* took only such rights as the county had, and is not a necessary party to a subsequent judgment annulling the tax.

3. A court of equity will not interfere to declare a tax invalid and restrain its collection unless the objections to the proceedings go to the very groundwork of the tax and necessarily affect materially its principle and show that it must be unjust and unequal. It is *not enough to show that the tax proceedings are irregular or void;* it must also appear that they are inequitable.

4. The fact that two business men in their testimony as to the value of lands which have been assessed for taxation differ considerably from the judgment of the assessor and board of review is not sufficient to impeach the assessment or to show intentional undervaluation.

516     SUPREME COURT OF WISCONSIN.     [82

Hixon and others vs. Oneida County and another.

5. The fact that in changing the valuations fixed by the assessor the board of review acted upon evidence which would not have been admissible in a court, does not warrant the interposition of equity to restrain the collection of the tax, where it does not appear that the result arrived at was unjust or inequitable, and where the increase in the plaintiffs' taxes was trifling.

6. The fact that during the necessary absence of the town clerk another person acted as clerk of the board of review, keeping minutes of the proceedings, but not taking any part in the deliberations or voting, and in no way influencing the action of the board, does not impair the validity of the proceedings of the board or afford any equitable ground for relief against the taxes based on its valuation.

7. The fact that the only record of the changes made by the board, other than the changes themselves, was kept on loose sheets of paper which, though filed in the clerk's office, were unsigned, is not ground for equitable relief against the taxes.

8. Irregularities in the assessment and tax rolls, such as the description of land partly by reference to preceding descriptions and the use of ditto marks, the omission of owners' names, etc., are *held* not to be grounds for relief in equity, where the assessor acted in good faith, the assessment was intelligible and certain, no inconvenience or embarrassment was caused to the plaintiffs, and none of such irregularities resulted in charging them with more than their just and equitable portion of the taxes.

9. The fact that no list of the towns in a county with the value of the taxable property therein was prepared, certified to, or filed, as required by sec. 1073, R. S., is not ground for equitable relief, where the county board determined the valuation of the property in each town, and adopted a resolution, which was signed by all its members, filed with the clerk, and recorded by him, levying a tax of a certain amount and apportioning it among the several towns, and where plaintiffs were in no way injured by the want of form or formal certification of the action of the board.

10. The fact that notice of the submission to the electors of a town of the question of levying a tax to build bridges was not properly given, though it may invalidate the tax, is not ground for equitable relief.

11. The failure to take a separate vote at the town meeting upon each of the items in the school estimates, as required by sec. 535, R. S., though it may render the tax void, is not ground for equitable relief.

12. Under subd. 1, sec. 776, R. S., the electors of a town may vote to raise money for cemetery purposes, the provisions of sec. 1440 in that behalf not being exclusive.

13. A new town, created from parts of other towns, was made abso-
lutely liable to each of the old towns for a portion of its indebted-
ness. The amounts so to be paid having been definitely and finally
liquidated, the town board of the new town caused them to be in-
serted in the tax roll. *Held*, that the fact that there had been no
vote by the electors of the town to levy a tax to pay said amounts,
though it may render the tax void, is not ground for equitable re-
lief against the tax.

APPEALS from the Circuit Court for *Brown* County.

This action was commenced to cancel, set aside, and re-
strain the collection of certain taxes on about 221 tracts
or more of land of the plaintiffs in the town of Eagle River
in Oneida county, for the year 1889, upon various grounds
set forth in the complaint, which were put in issue by the
answer of the defendants. The finding of the court as to
facts proved is quite lengthy and elaborate, the material
parts of which are, in substance, as follows:

(4) The assessor of the town of Eagle River, in describ-
ing the real property on the assessment roll for the year
1889, did not make a correct and full description of each
tract of land so that, read by itself without reference to
the preceding descriptions, it would clearly designate the
property, but at the top of the page would enter a full de-
scription of the northeast quarter of some quarter section,
carrying out the section, town, range, number of acres, and
valuation in the proper columns, and for a description of
the other forty-acre tracts in said quarter section would
only give the first two initial letters, as " N. W.," without
giving the initial letters of the quarter section of which it
formed a part, or putting any figures or marks in the col-
umns for section, town, or range, but giving the number of
acres either in figures or by ditto marks, and giving the
assessed value, so that when the four tracts in a quarter
section were thus entered, the four initial letters for one
tract in the next quarter section would be given, with num-
ber of acres and valuation, and when a new section was

reached its number would be placed in the appropriate column opposite the first description in said section, and so with a new town or range. Where sections were fractional, only the numbers of the lots were given, with the number of acres and the valuation of each. In some instances the word "lot" was written before the first number, and in others the word "lot" does not appear in connection with any of the numbers. No names were entered in the column for owners' names. In some cases the assessor discovered that he had omitted certain descriptions, and instead of placing them out of their order at the end of the book he entered them opposite the description in the section where they belonged in the blank column for owners' names, by writing first the town, range, and section, and under it the initial letters of the tract, with the valuation fixed by him, as "Lot 1, $10," or "S. E. S. E., $20." In the column headed "Value Fixed by the Assessor," opposite some descriptions appeared the letter "S," opposite some the letter "V," and opposite some the letter "W," with no valuation. In some cases, opposite such lands are values fixed by the board of review. When the assessor made the roll he understood that these lands were state or government lands, not taxable, and he placed the letter "S" to designate state lands, the letter "V" to designate vacant government lands, and the letter "W" to designate government lands reserved for water purposes. After the roll was completed and lists of entries obtained from the state and United States land officers, it was found that some of these lands had been entered and were taxable, and the assessor and board of review placed a valuation on them. The town of Eagle embraced over 576 square miles of territory, the greater portion of which was liable to taxation. Each tract of land was described on the roll as hereinbefore indicated, and was valued by the assessor, except those understood to be exempt, and such as were afterwards found

to be taxable valued by the assessor and board of review. All these descriptions were understood by the assessor, by the board of review, by the town treasurer and clerk, and the taxpayers of the town. The tax roll for said year was made from said assessment roll by describing the property in the same manner as on the roll, except that those tracts described on the assessment roll in the column headed "Owners' Names" were put in their proper place in regular order. Taxes for said year on the greater portion of the lands in said town were paid to the town treasurer. A delinquent return was made by the town treasurer to the county treasurer of all lands on which the taxes for that year had not been paid, in which each tract of land was fully and accurately described; and the taxes were afterwards paid to the county treasurer on nearly all of the lands on which payment had not been made to the town treasurer except said lands belonging to the plaintiffs. No inconvenience or embarrassment has resulted to said plaintiffs from the manner or form in which said assessment roll was made, and no error or defect therein has resulted in charging them with any more than their just and equitable portion of the taxes of said town for said year.

(5) As to all the irregularities in respect to the form of roll and description of property the assessor acted in good faith, following the practice of former assessors for said town.

(6) And he also so acted in making what he regarded a fair and equitable valuation from actual view in part, and from the best information he could practically obtain in part, and without intentionally discriminating against any or in favor of any; and the board of review, in reviewing said assessment, acted in the same manner.

(7) No watches were assessed by the assessor for that year. There were watches belonging to residents and taxpayers of the town and assessable for that year of a true cash value of $2,000 and upwards. Neither of the plaint-

iffs resided in said town or had a watch assessable therein in 1889; and the fact that no watches were assessed was not brought to the attention of the town board of review as a board. One member of the board knew the facts. It does not appear that the assessor knew that there were watches assessable in said town for said year, or that he intentionally omitted to assess any such watches.

(8) For several days during the sessions of the town board of review during said year the clerk was absent on account of his father's death, and his brother was authorized by the board to act as their clerk, and did so act, keeping such minutes and records of their proceedings as were kept; but it does not appear that he took part in their deliberations, or voted on any question, or in any way influenced the action of the board.

(9) No witnesses were examined by or before the board, and no evidence was before them except unverified but true copies of reports of land inspectors who had inspected the land in the town under appointment from the board of supervisors of the county. Numerous changes were made in the assessor's valuation of the wild lands in the town, and the only record thereof, other than the changes themselves as shown on the roll, was kept on loose sheets of paper, without signature, and filed in the town clerk's office. The only other record of the proceedings of said board was kept in the record book kept by the town clerk, showing meetings and adjournments; but this was not signed by the town clerk. The result of the changes in assessor's values made by said board was to increase the relative value of plaintiff's lands not to exceed $300.

(10) The entire tax carried out on the roll was $32,945.23, $4,341.10 of which was carried out opposite to and charged against plaintiff's lands, and was the proportion properly chargeable to said lands according to said assessment as equalized.

(11) The records of the town were kept in a book prepared by some blank book manufacturer, containing headings showing for what purpose it was used, and in which the clerk recorded the proceedings of the town board and of the town meetings of said town. None of the records were signed by the town clerk, and were not in any other way authenticated than by being made by the clerk in his own handwriting in said book kept by him in his office. The original minutes of the town meetings were taken on loose sheets of paper, which were filed in the clerk's office.

(12) This record shows, as the fact is, that at the annual town meeting held April 2, 1889, the following appropriations were voted: For general fund, $2,000; for highway fund, $5,000; for bridge fund, $300; for school fund, $4,500; for cemetery fund, $1,000; for repairs on town hall, $500; to build sidewalk on bridge, $600; total, $13,900.

(13) The record shows that at a meeting of the town board held the 11th of December, at which all the members were present, a motion was made and carried that the following amounts be put in the tax roll for the ensuing year: General fund, $2,000; town hall fund, $273.14; cemetery fund, $371.25; bridge fund, special bridge fund, $3,500; general, $300; highway fund, $4,045; town of Ackley, $1,550; town of Merrill, $1,740; bridge bonds, $1,070; school fund, $4,500; judgment orders, $60; total, $19,409.39.

(14) There is no record of any action by the town board or by the electors of said town at any meeting during the year 1889 relative to cemetery, cemetery fund, or tax for cemetery purposes, other than as above stated.

(15) At a meeting of the supervisors, March 19, 1889, a resolution was adopted and signed by them for building two bridges across the Wisconsin river at specified points in the town, and that $3,500 be raised for the coming year

to build them, and that the resolution be submitted to the electors at the annual town meeting, the manner of voting to be as follows: "For bridges," and "Against bridges."

(16) Notices of the submission of this question, stating the manner in which the vote was to be taken, were posted in three of the most public places in the town, but not so posted fifteen days before the meeting.

(17) Although there was a newspaper printed in the town, no notice of said submission or vote was published therein.

(18) At the annual town meeting, April 2d, said resolution was publicly read, and a vote by ballot taken thereon in proper manner, and canvassed, showing 231 votes for bridges and four against. The highest number of votes cast for any office voted for at this meeting was 415.

(19) These bridges were built and completed by July, 1889, at a cost of $3,500, and the full price was paid by the town prior to the commencement of this action.

(20) The town of Eagle River was created by ch. 229, Laws of 1885, out of the territory taken from the towns of Pine River and Ackley in Lincoln county. This act provided that portions of the indebtedness of Pine River and Ackley should be charged to said town of Eagle River and paid by it to Pine River and Ackley, said indebtedness to be apportioned in the same ratio as the assessed value of the portion of the territory detached, as shown by the last assessment roll; and by ch. 411 of the laws of that year the county of *Oneida* was created from a portion of the territory of Lincoln county, including said town of Eagle River and a portion of the town of Merrill, and the new county of *Oneida* was by said act divided into two towns, to wit, Eagle River and Pelican, so that said portion of said town of Merrill became a portion of said town of Eagle River.

(21) At a meeting of the board of supervisors of Eagle River, March 30, 1887, at which the chairman of the town of Ackley was present, a full settlement of the claim of that town against Eagle River was agreed upon at the sum of $1,550, to be paid March 20, 1890, and an order was issued therefor, dated and payable as aforesaid.

(22) The chairman of said town of Eagle River and the chairman of Merrill, representing their respective towns, agreed upon a settlement of the amount of indebtedness of Eagle River to Merrill at $3,252.33, and a memorandum of said settlement was reported to the meeting of the board of supervisors of the town of Eagle River held prior to 1889, and the action of said chairman in making such settlement was ratified by a vote of said meeting.

(23) But no vote was taken at the annual town meeting in 1889, or at any town meeting, to raise a tax that year to pay the indebtedness or any portion of it to said town of Ackley or of Merrill.

(24) At a meeting of the school board of said town, March 18, 1889, the town board was recommended to raise the following items for school purposes, viz.: Wages, $2,000; janitor, $200; wood, $200; Minocqua, $500; incidentals, $1,100; library, $180. But no vote was taken at the annual town meeting upon these several items, but one item of $4,500 was appropriated for school fund, as stated in the twelfth finding. At a meeting of the school board, October 10, 1889, the secretary submitted a report showing that at the last town meeting $4,500 was appropriated for school purposes, and that the estimates of the amounts required for the different purposes were: Teachers' wages, $1,950; janitor, $200; wood, $300; school books, $100; school furniture, $350; school supplies, $75; building fund, $500; improvement of school-house, $200; incidentals, $400; total, $4,175; and outstanding school orders to the amount of

$258.85.   The same person who was town clerk during said year was also secretary of the school board.

(25) The full amount of $19,409.39, as stated in the fourteenth finding, was included in the taxes of said town for said year as carried out on the tax roll.

(26) At the annual meeting of the board of supervisors of the county, November 22, 1889, the county clerk laid before the said board an abstract of the assessment rolls of the three towns in said county, viz., Pelican, Eagle River, and Minocqua, for said year 1889, showing a total valuation of Pelican at $966,367; Eagle River, $725,350; Minocqua, $698,158.   The members of said board, acting in committee of the whole, determined to alter said total valuation so as to divide the aggregate of said sums between said towns, in the proportion of five tenths to Pelican, three tenths to Eagle River, and two tenths to Minocqua, and to increase the valuation of Pelican and lower the valuation of said other towns accordingly.   No list of the towns of said county, with valuations set opposite as fixed by the board, as required by sec. 1073, R. S., was prepared, certified to, or filed during that year, but a resolution was drawn, adopted by the board, signed by all the members, filed with the clerk, and recorded by him in the records of the proceedings of said board, levying a tax on the taxable property of *Oneida* county for the current year in various items, amounting in all to $38,000, to be apportioned and collected in the several towns of *Oneida* county as follows, to wit: Pelican, $21,176.25; Eagle River, $13,535.94; Minocqua, $7,835.80.

(27) The said sum of $13,535.94, together with said sums ordered by said town' board to be put into the tax roll as stated in the foregoing thirteenth finding, making $32,935.23, constituted the taxes carried out on the tax roll of said town for that year; the only statement showing the

several amounts of taxes levied and the purposes for which they were levied, entered upon or annexed to said tax roll by said clerk, was as follows:

STATEMENT.

" Assessed value of the town of Eagle River . . . . . $732,118.00
" Total amount of taxes is . . . . . . . . . . . . 32,935.23
" As follows:  State tax  . . . . . . . . . . . . 3,786.67
                County tax . . . . . . . . . . . . 9,741.17
                Town tax  . . . . . . . . . . . . 19,409.39
    "$4,500.00 of the town tax is school tax and rate is 62¼ cents to $100.
Rate per cent 4½ as follows:
" State  . . . . . . . . . . . . . . . . . . $ .51⅛ to $100.00
" County  . . . . . . . . . . . . . . . . . 1.33⅛ to  100.00
" Town  . . . . . . . . . . . . . . . . . . 2.04  to  100.00
" School . . . . . . . . . . . . . . . . . .  .61⅛ to  100.00

            " Total  . . . . . . . . . . . $4.50  to $100.00
                                      "G. O'Connor, Clerk."

(28) An order was issued in this action on the 7th of April, 1890, enjoining the sale of plaintiffs' lands at the annual tax sale of delinquent lands for the year 1890, which was vacated July 25, 1890; and thereafter, August 26th, the lands were again advertised to be sold September 26th, and on that day they were sold by the treasurer for the nonpayment of the taxes thereon to said county of *Oneida.* Tax certificates were issued to said county accordingly, which were assigned, prior to December, 1890, by the county to one Wilcox, now owning and holding the same, and a resident of this state.

(29) On the 2d of October, 1890, the county treasurer prepared and signed an affidavit of the posting of notices of sale, and swore to the same before one Nichols, who was deputy clerk of the circuit court for *Oneida* county. Nichols did not sign his name to the jurat, but wrote the name of "F. W. McIntyre, Clerk Circuit Court, *Oneida County,* Wis.," without anything to indicate that said name was written by Nichols and not by said McIntyre, and affixed

thereto the seal of the court. This affidavit was not filed in the office of the county clerk of the county, but on the 15th of December, 1890, the county treasurer drew and signed an exact copy of said affidavit, and procured said Nichols to add the name of said McIntyre as it was written on said affidavit, and the seal of said court; and the said treasurer filed said copy in the office of the county clerk.

(30) On the 26th of October, 1890, an affidavit was made and sworn to by the printer and publisher of the paper in which said notice was published, showing due publication of "the annexed printed notice." After said affidavit was made, it was altered by said printer, who wrote after the words "the annexed printed," and before the word "notice," the words "statement and;" but the affidavit was not again sworn to.

(31) On the 15th of December, 1890, both of said affidavits were filed in the office of the county clerk, together with a statement containing a particular description of each tract of land sold by said county treasurer on said 26th day of September, 1890, specifying the name of the person to whom sold, and the amount for which the same was sold; but no papers relative to said sale were filed in the county clerk's office prior to the 15th day of December, 1890.

(32) The amount carried out in said taxes against plaintiffs' lands for "town of Ackley" and "town of Merrill" was $434.54, and the balance of said taxes against said lands was $3,906.56.

As conclusions of law the court found:

"(1) That the items included in said taxes for town of Ackley and town of Merrill were never levied or authorized by any body clothed with power to levy taxes, and were unlawfully included in said taxes, and were not valid taxes against said plaintiffs' lands.

"(2) That none of the irregularities in the tax proceed-

ings, including the assessments, equalization, levy, and county assessments, were such as to affect the justice or equity of the plaintiffs' taxes, or to charge them with more than their just proportion of the taxes of said town; and that they are not entitled to relief in equity against said taxes, except said items for Ackley and Merrill.

"(3) The plaintiffs are entitled to judgment setting aside and annulling said taxes, and declaring said sale and certificates null and void, with costs, *on condition* that they pay into court, for the use and benefit of the parties entitled thereto, within thirty days from the service of the finding on the plaintiffs' attorneys, said sum of $3,906.56, with interest thereon at the rate of twelve per cent. per annum from the 1st day of January, 1890, to the date of payment; and on failure of plaintiffs to pay said sum with interest, aforesaid, the defendants will be entitled to judgment dismissing plaintiffs' complaint without costs to either party.

"(4) That at any time after the expiration of said thirty days the plaintiffs may apply to the court, on due notice to the defendants' attorneys and proof of the performance of the foregoing condition, for judgment pursuant to these conclusions; and on notice to the plaintiffs' attorneys, and on due proof of the nonperformance of said condition, the defendants may apply for judgment according to said conclusions."

The plaintiffs filed various exceptions to the findings of fact and conclusions of law. Defendants excepted also to the failure of the court to find that a town order was issued for the payment of $3,252.33 found due the town of Merrill on the settlement made and ratified as stated in the twenty-second finding, and to the failure of the court to find that the sum of $1,740 put on the tax roll, as found in the thirteenth of said findings, was for a part of said sum; and also to various other findings of fact, and the conclusions of law. The plaintiffs requested the court to find,

among other things, that the assessor of said town, in val-
uing the real estate in the village of Eagle River, did not
assess the same at the full value which could ordinarily be
obtained for it at private sale, and did not assess or value
the personal property at its true cash value, as the said as-
sessor then well knew; and further, that he knowingly and
intentionally placed a valuation on the personal property
very much below its actual cash value, and upon the real
estate very much below its full value which could ordinarily
be obtained therefor at private sale; and that the board of
review, in reviewing the assessment, knowingly and inten-
tionally placed and left the valuation upon the real estate
in said village very much below the full value which could
ordinarily be obtained therefor at private sale, and upon
the personal property very much below its true cash value;
but the court refused to so find.

Within thirty days after the decision of the court was
signed and filed, plaintiffs paid into court, under protest,
the amount, with interest, required by the decision to be
paid by them as a condition of judgment setting aside and
annulling the taxes on plaintiffs' lands for the year 1889
described in the complaint, and annulling the sale of said
lands for said taxes. Such protest was on the ground that
the decision was erroneous and unjust and that the plaint-
iffs ought not to be required to make such payment as a
condition of relief. The amount so paid, with interest, was
$4,548.53, and the bill of exceptions states that it still re-
mains in court. Plaintiffs afterwards, June 17th, applied
to the court for judgment in accordance with the decision,
which was entered accordingly. The judgment purports to
have been entered on motion of the plaintiffs' attorneys.
Both parties appealed from it.

For the plaintiffs there were briefs by *Curtis & Curtis*,
and oral argument by *H. H. Curtis*.

For the defendants there were briefs by *Levi J. Billings*,

attorney, and *Geo. G. Greene,* of counsel, and oral argument by *Mr. Billings.*

PINNEY, J. There are cross appeals in this cause, each party having appealed from the entire judgment. The defendants insist that the plaintiffs cannot maintain their appeal, for the reason that they waived the right to appeal by complying with the terms of the finding of the court to the effect that they were entitled to relief only upon paying into court the sum of $3,906.56, the balance of the taxes complained of, after deducting the items found by the court to be illegal, namely, the items for the towns of Ackley and Merrill, amounting on plaintiffs' lands to $434.54, and by taking the benefit of the decision by entering and perfecting judgment accordingly.

1. The right of appeal is favored in law, and it will not be held to have been waived except upon clear and decisive grounds. *Sloane v. Anderson,* 57 Wis. 128, 129; *Chapman v. Sutton,* 68 Wis. 661. Payment of a judgment is not a waiver of the right to bring an appeal or writ of error to reverse it. This case is clearly distinguishable from *Webster-Glover L. & M. Co. v. St. Croix Co.* 71 Wis. 317, where the judgment contained provisions in favor of the party who appealed as well as provisions against him, and he, *after* the entry of judgment, accepted the money adjudged to him and then appealed from the provisions of the judgment against him. The court held that by accepting *the fruits of the judgment* he waived his right of appeal. The plaintiff could not appeal from the finding or decision. *Webster-Glover L. & M. Co. v. St. Croix Co.* 63 Wis. 647; *Bourgeois v. Schrage,* 69 Wis. 316. Here the court had decided that the plaintiffs were entitled to a less favorable judgment than they had asked, and to that only upon condition of paying into court, " for the use and benefit of the parties entitled thereto," the sum mentioned; and it is recited in the

judgment that the payment into court of the sum required was under protest. The plaintiffs had a right to appeal from a judgment in their favor, and the payment of this money into court was with the view of perfecting the less favorable judgment awarded to them. The fact that they perfected such judgment, and paid money into court to that end, ought not to be construed as a waiver of their right to appeal from it and obtain a more favorable one, and to reclaim the money so paid in, or of the party who might have received it. Money paid under a judgment afterwards reversed may be recovered back. If, *after* the judgment had been perfected, the plaintiffs had accepted the benefit of any provision of it, they would properly be held to have waived their right of appeal, as in *Webster-Glover L. & M. Co. v. St. Croix Co.* 71 Wis. 317.

2. It is also insisted that the defendants have waived and cannot maintain their appeal, by reason of having withdrawn the money thus paid in; but there is nothing in the record to sustain the contention. The bill of exceptions states that the money was paid to the clerk of the court " and still remains in court." There is nothing to show that it has been withdrawn. Both appeals are therefore properly before the court for determination.

3. The action was commenced before the sale of the lands in question, and, the injunction awarded having been dissolved, they were again advertised for sale and sold; and it is said that the certificates of sale have been assigned by the county to one Wilcox, and that he is a necessary party to a decree annulling them; but Wilcox was a purchaser *pendente lite*, and took only such rights as the county had, and he is in no better position. These certificates are not negotiable in the sense that the assignee of them acquires any better right than the purchaser, and a judgment annulling the tax will necessarily destroy the tax certificates and defeat any tax deed on them. *T. B. Scott Lumber Co. v. Oneida Co.* 72 Wis. 158.

Hixon and others vs. Oneida County and another.

4. The counsel for plaintiffs, in an able and elaborate brief, has assailed the doctrine laid down by this court at an early day, that a court of equity will not interfere to declare a tax invalid and restrain its collection, unless the objections to the proceedings are such as go to the very groundwork of the tax and necessarily affect materially its principle and show that it must necessarily be unjust and unequal; that it is not enough to show that the tax proceedings are irregular or void, but it must also appear that they are *inequitable* and that it will be against conscience to let them go on; that courts of equity do not sit to reverse or correct errors and mistakes of law, and that, to be entitled to their assistance, the party applying must show that he is in danger of unjustly losing some substantial right, and that he is in no fault. *Mills v. Gleason,* 11 Wis. 497; *Warden v. Fond du Lac Co.* 14 Wis. 618, 621; *Miltimore v. Rock Co.* 15 Wis. 9; *Dean v. Gleason,* 16 Wis. 1; *Bond v. Kenosha,* 17 Wis. 284; *Mills v. Johnson,* 17 Wis. 598; *Crane v. Janesville,* 20 Wis. 305; *Ballard v. Appleton,* 26 Wis. 67; *Whittaker v. Janesville,* 33 Wis. 76; *Mills v. Charleton,* 29 Wis. 400,— and many other cases in this court and in other courts of the highest respectability,— are to the same effect. It is true that these cases were understood to have been discredited and departed from to some extent by the case of *Marsh v. Clark Co.* 42 Wis. 502, and the succeeding cases of *Philleo v. Hiles,* 42 Wis. 527; *Tierney v. Union L. Co.* 47 Wis. 248; *Schettler v. Ft. Howard,* 43 Wis. 48; *Goff v. Outagamie Co.* 43 Wis. 55; and *Plumer v. Marathon Co.* 46 Wis. 163; and it is upon the strength of these cases that the plaintiffs' counsel in the main founds his argument upon their appeal; but in very many subsequent cases the authority of the former cases has been fully restored, and frequently restated and vindicated with increased vigor and clearness. The whole subject was considered, and elaborately and forcibly discussed.

by Mr. Justice TAYLOR, in *Fifield v. Marinette Co.* 62 Wis. 532, and the views there expressed have been adhered to and followed in many cases. We see no reason for doubting or departing from the doctrine as originally established in this state, and we cannot agree with counsel for appellants that the principles thus laid down are at all obscure or uncertain, or that there is any reason for misapprehension of the rule for granting relief in such cases, since the cases of *Fifield v. Marinette Co.* 62 Wis. 532; *Wis. Cent. R. Co. v. Lincoln Co.* 67 Wis. 478, 481; *Canfield v. Bayfield Co.* 74 Wis. 60, 64; *Boorman v. Juneau Co.* 76 Wis. 550; *Green Bay & M. Canal Co. v. Outagamie Co.* 76 Wis. 588; *Kaehler v. Dobberpuhl,* 56 Wis. 480; *Wis. Cent. R. Co. v. Ashland Co.* 81 Wis. 1,— were decided.

5. The objections taken to the assessment are various, but, within the authorities referred to, we must hold they afford no ground for relief. The claim that the proof shows that there was any intentional omission of property from the assessment is negatived by the sixth and seventh findings of the court, which we think are in accordance with the evidence, and so, also, as to the claim that there was an *intentional* undervaluation of real and personal property in the town of Eagle River. The evidence on the subject of undervaluation of real estate is confined wholly to about eighteen lots in the village of Eagle River, and consists of the testimony of two business men of that place. The fact that in relation to the value of those lots they differed very considerably from the judgment of the assessor and board of review is not sufficient to impeach the integrity of the assessment, or to show meditated or intentional wrong, and is not inconsistent with the finding of the court, after hearing the witnesses testify, in favor of the *bona fides* of the assessment; and the same observations hold good in relation to alleged undervaluation of personal property. The evidence wholly fails to show that the assessment as an en-

tirety, the plaintiffs' property included, was unfair or inequitable so far as they are concerned, or that there was any intentional undervaluation of property, or any illegal or improper classification of property for the purposes of assessment.

6. The objections to the proceedings of the board of review depend upon the eighth and ninth findings, and are, in substance, that the board of review changed valuations fixed by the assessor without lawful evidence; that the board used unverified, but true, copies of land inspectors' reports, the original or duly certified copies of which would have been competent evidence (*T. B. Scott Lumber Co. v. Oneida Co.* 72 Wis. 158), and the record of proceedings of the board was imperfectly or inartificially kept. The changes made by the board increased the relative valuation of the plaintiffs' lands not to exceed $300, and there is nothing to show that the result arrived at by the board was unjust or inequitable; besides, the increased amount of plaintiffs' taxes on their 250 or more tracts of land, when distributed between them, would be so trifling and inconsiderable as not to warrant the interposition of the discretionary power of a court of equity in granting injunctions. The maxim, *de minimis non curat lex*, may be fairly applied, and public policy requires that for such trifling excess the plaintiffs should be left to their remedy at law. The board of review cannot be said to have acted arbitrarily and without any evidence, though that which they did have was not technically verified so as to be admissible in a court of law. We are unable to see that the plaintiffs have suffered or are exposed to injury by reason of the defect in the lists. The necessary absence of the town clerk on account of his father's death during some of the days the board was in session, and the fact that his brother was authorized by the board to act and did act as their clerk, keeping minutes of their proceedings, etc., but not taking any part in their

deliberations or voting on any question, did not, we think, impair the validity of the proceedings of the board, and does not afford any equitable ground for the plaintiffs to avoid payment of their taxes. The court found that the temporary clerk did not influence the action of the board.

7. The objections to the manner in which the assessment roll, and the tax roll founded on it, were made out, and to the unsigned proceedings of town meetings and proceedings of the board of review, are readily understood by reference to the fourth and ninth findings. The assessment seems to have been made intelligible and certain, and the minutes and proceedings of the town meetings and of the board of review, though imperfectly prepared, were in the handwriting of the clerk and kept in his office; and it is found that as to all the irregularities in the assessment roll the assessor acted in good faith, following the practice that had prevailed, that no inconvenience or embarrassment has thereby resulted to the plaintiffs, and no error or defect in the roll has resulted in charging them with any more than their just and equitable portion of the taxes of said town for that year. These and kindred objections form no ground for relief in equity. They are like those made to unsigned or unverified assessment rolls. *Wis. Cent. R. Co. v. Lincoln Co.* 67 Wis. 478. And so, also, that the lands were not put down as belonging to some particular owner, or to "Unknown." *Wis. Cent. R. Co. v. Price Co.* 64 Wis. 580. The action of the county board, as set forth in the twenty-sixth finding, though not an exact was a substantial compliance with R. S. sec. 1073. The objections taken to it, like those just considered, are not available in equity. There is nothing to show that the plaintiffs have been injuriously affected by want of form or formal certification of the action of the county board. The resolution contains the substance required by the statute, was signed by the members of the board, and filed with the county clerk, and

recorded by him in the records of the proceedings of the
board.

8. The objection that the court refused to hold the
plaintiffs' taxes invalid by reason of the levy of $3,500 as
a tax for bridges, is based upon the fifteenth, sixteenth,
seventeenth, eighteenth, and nineteenth findings. The res-
olution adopted by the supervisors of the town, March 19,
1889, was that $3,500 be raised to build bridges for that
year, and that it be submitted to a vote at the annual
town meeting to be held the 2d of April, as provided by
secs. 1320, 1321, R. S.; and specified the manner of voting,
and we think is to be construed as a proposition to levy
a tax. The building of the bridges was doubtless a public
necessity. The town paid for them, and the levy of the
$3,500 was but to reimburse it for using its funds in con-
structing the bridges. The amount levied on the plaint-
iffs' lands is, as it appears, no more than their just share
of this public burden which has been, it seems, discharged
by nearly every property owner in the town except the
plaintiffs. There is nothing to show that there has been
any inequitable or unjust apportionment of this sum, used
for a purpose which the town had authority to accomplish.
It may be conceded that the levy was void, but there is
not the slightest evidence to show that it was inequitable.
At law, the contention of the plaintiffs in regard to it
would undoubtedly prevail. The plaintiffs might have ob-
tained a remedy against the levy of this tax by *certiorari*,
and they still have their remedy at law. They have no
right, however, to come into equity and ask that the tax
be enjoined, simply upon showing that it is illegal. A
court of equity will not enjoin the collection of a judg-
ment void because the court had no jurisdiction to render
it. This was so held in *Stokes v. Knarr*, 11 Wis. 389. It
was there held that, "if a party can say nothing against
the justice of a judgment, can give no reason why in equity

he ought not to pay it, a court of equity will not interfere, but will leave him to contend against it at law in the best way he can." And in *Warden v. Fond du Lac Co.* 14 Wis. 618, the principle of *Stokes v. Knarr* was expressly held to be applicable to suits to restrain the collection of taxes.

9. The objection to the levy of $4,500 for school fund is that it does not appear that the items of which it was composed were voted on *separately*. The twelfth finding shows that $4,500 was voted at the annual town meeting for school fund; the school board of the town having, at a previous meeting, recommended, as required by secs. 534, 535, R. S., that the following items be raised for school purposes, viz.: Wages, $2,000; janitor, $200; wood, $200; Minocqua, $500; incidentals, $1,100; library, $180. It is made the duty of the town supervisors to present the estimates of the school board to the electors of the town at the annual town meeting. The presumption is that the estimates were presented accordingly. It was not necessary that the defendants should offer evidence to show that the statement or estimates were presented to the town meeting. The burden of showing that the tax is not only illegal but inequitable is on the plaintiffs. There is no presumption that the levy in gross embraced any sum for any particular item in excess of what is allowed by law. The minutes of the town meeting do not appear to have been produced in evidence, but merely the general statement of the appropriations. The town had the authority to raise $4,500 for school purposes as a gross sum. S. &. B. Ann. Stats. sec.430*a*. A failure to take a separate vote upon the different items authorized to be recommended, constituting the gross sum, would not make the plaintiffs' taxes inequitable or unjust, although perhaps void at law.

10. The tax levied for cemetery purposes is also assailed as illegal. Subd. 12, sec. 776, R. S., gives town meetings power "to instruct by vote the town board to purchase

grounds for a town cemetery, to limit the price to be paid, and to raise a tax for the payment." The vote was simply to appropriate $1,000 for cemetery fund. Whether it was intended to purchase grounds for a cemetery or to provide a fund for a cemetery already existing, is not clear. It may be that either was intended; and either would, no doubt, be within the power of the town. The town voted $1,000. That, of itself, would amount to a limit to purchase, but it appears that they only appropriated for that purpose $371. The first subdivision of sec. 776 empowers the electors to raise money for the repair and building of roads and bridges, for the support of the poor, and for defraying *all other* proper charges and expenses of the town, notwithstanding provision is made by sec. 1440, R. S., for devoting the proceeds of sales of lots to the payment of debts incurred by the town in fencing and embellishing cemetery grounds and the avenues leading thereto, and in defraying the necessary expenses of the management and care of the same, or for reimbursing the town for the purchase money thereof, and for no other purpose. This resource may prove entirely inadequate, and it cannot be said that the town would not have authority to levy a tax for cemetery purposes, if need be. There is no proof on the subject, and no presumption can be made against the levy. The presumption is that an exigency existed requiring the raising of that sum. The provisions of sec. 1440 are not, in their terms, exclusive.

The evidence seems to support and justify the findings of fact, and it is not necessary that the court should find as requested by the plaintiffs on some points that no evidence in relation thereto was produced. That which is not made to appear is to be taken as not existing.

11. The only question presented by the defendants' appeal is whether the circuit court erred in holding that collection of the amount included in the tax roll as extended for the town of Ackley and for the town of Merrill, ought

to have been enjoined,— whether a court of equity should enjoin the tax as void at law, without regard to the question of whether the amount so charged against the property was more than the fair share which the plaintiffs' property ought to contribute to pay off and discharge the debts of the town of Eagle River to these towns growing out of the division of the towns of Merrill and Ackley and organization of the town of Eagle River. The facts are fully stated in the twentieth, twenty-first, and twenty-second findings, and the circuit court granted relief as to these items conditionally, as we have seen, for the reason, as stated in the finding, that "no vote was taken at the annual town meeting in 1889 or any town meeting to raise a tax that year to pay the indebtedness or any portion of it to said towns;" and that "the plaintiffs show sufficient injury to entitle them to equitable relief, when they show that the authorities are attempting to collect from them, as a tax, an item which has never been levied as a tax by any body authorized to levy it." These items were inserted in the tax roll upon and by direction of the town supervisors, as shown by the thirteenth finding.

By sec. 4, ch. 229, Laws of 1885, creating the town of Eagle River from parts of the towns of Ackley and Pine River, it is provided that "the indebtedness to be apportioned to the town of Eagle River to bear the same ratio to that apportioned to each of the other towns hereinbefore mentioned as does the assessed valuation of that portion of the town detached bear to that situated in the town from which the said territory was detached by this act to the last assessment rolls of said towns, and *the said town of Eagle River shall pay its proportion* of indebtedness, ascertained as aforesaid, to the towns of Pine River and Ackley respectively." By a subsequent act (Laws of 1885, ch. 334, sec. 2), it was enacted that "when any territory shall be detached from any town, . . . and the same shall be

annexed to any other town, . . . the town to which
the same shall be annexed . . . *shall be liable to the
town* . . . from which the territory was so detached
for its just share of the liabilities and indebtedness, and
shall receive the just share of the credits from the town
. . . from which the same shall have been detached,
which shall be apportioned by ascertaining what ratio
the portion detached bears to the territory from which
the same was detached, and the last prior assessment shall
be used as a basis in determining the same." And by ch. 411,
Laws of 1885, creating the county of Oneida, part of the
town of Merrill was attached to the town of Eagle River.
The amount due from Eagle River to Ackley was adjusted
by the supervisors of the two towns, March 30, 1889, at
$1,550, to be paid March 30, 1890, and an order issued for
that amount. The amount due the town of Merrill from
Eagle River was determined and agreed on as stated in the
twenty-second finding, and was reported to and ratified by
a vote of the town meeting of the town of Eagle River
prior to 1889. The amounts which the town of Eagle
River was required to pay the towns of Merrill and Ackley,
respectively, had thus become definitely and finally liqui-
dated. The matter of adjusting these claims was one
which pertained to the duties of the town board, and could
be more properly attended to and adjusted by them than
by the town meeting. By sec. 819, R. S., the town board
has " charge of all of the affairs of the town not by law
committed to other officers," and they are empowered to
draw orders to pay the town expenses, and " for all other
purposes except the support of the common schools," and
sec. 821 authorizes them to audit " every account presented
against the town." Every reasonable presumption ought
to be made in support of these proceedings. *Tainter v.
Lucas,* 29 Wis. 375; *Fifield v. Marinette Co.* 62 Wis. 532.

And there is an utter absence of allegation or proof showing, or tending to show, that these amounts have not been adjusted on the proper basis and at just and correct amounts. The town had really no discretion as to the payment of these sums. It was bound by express statute to pay them, and as the town has no other resource for paying these claims than taxation, when once liquidated and reduced to certainty the vote of the town to levy a tax to pay them, if essential, is matter of mere form, for in substance the statutes referred to have authorized a tax to pay them. In no way whatever could the plaintiffs' property escape its liability to contribute its just proportion to the payment of these demands. Levying and carrying out the tax was a method of apportioning this common burden, and there is nothing to show that any more than its just and equitable portion was entered under the direction of the supervisors, and carried out as a tax against the property of the plaintiffs. Nearly all the entire tax for this purpose has been paid, except the amount charged against the plaintiffs, and the plaintiffs have not shown the least equity for the court to interfere by injunction to stay or prevent its collection. They rely only on the contention that the tax is void, that it was not charged against their lands by any body having power to levy a tax. For reasons already pointed out, " when a tax-payer undertakes to stop the officers of the law from collecting a tax charged against his property, by a proceeding in equity, he should be required to demonstrate by his complaint (and of course by his proof) that his property is not legally *or equitably chargeable therewith.*" *Kaehler v. Dobberpuhl,* 56 Wis. 486, and cases cited *ante.* The plaintiffs do not occupy any more favorable position than a party seeking to enjoin a judgment at law void for want of jurisdiction, who fails to allege or show that it is also inequitable. *Stokes v. Knarr,*

11 Wis. 389; *Walker v. Robbins,* 14 How. 584; *Knox Co. v. Harshman,* 133 U. S. 152, 156; *Warden v. Fond du Lac Co.* 14 Wis. 620.

For these reasons we conclude that, conceding the invalidity of the tax; yet the plaintiffs have no standing in a court of equity on that ground merely, but must be left to their remedy at law.

*By the Court.*— The judgment of the circuit court is reversed on both appeals, and the cause is remanded with directions to dismiss the plaintiffs' complaint, and to make such order for the disposition of the money paid in court as shall be according to law.